# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 00-1408

———————

| | | |
|---|---|---|
| Victoria A. Howard, | * | |
| | * | |
| Plaintiff – Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Southern District of Iowa |
| Larry Massanari, Acting Commissioner, | * | |
| Social Security Administration,[1] | * | |
| | * | |
| Defendant – Appellee. | * | |

———————

Submitted: November 14, 2000

Filed:  July 10, 2001

———————

Before BEAM, HEANEY, and BYE, Circuit Judges.

———————

BYE, Circuit Judge.

Victoria Howard applied for disability insurance benefits and supplemental security income benefits from the Social Security Administration (SSA) based on her various medical conditions.  After a hearing, an Administrative Law Judge (ALJ) denied her request, finding that she was not under a disability as defined by the Social

———————

[1]Larry Massanari has been appointed to serve as Acting Commissioner of Social Security and is substituted as appellee pursuant to Fed. R. App. P. 43(c).

Security Act.  Howard sued the Commissioner in the district court,[2] who decided in favor of the Commissioner.  She now appeals to us.  We affirm the decision of the district court.

I

Howard was 50 years old at the time of her hearing before the ALJ.  She had been working as a certified nurses' aid (CNA) until recently.  She has had several physical health problems.  She suffered from limb-threatening distal aortic disease with occlusion of the left iliac artery in its entirety and chronic ischemia, which caused persistent pain in her left foot.  Doctors performed an aortobifemoral bypass.  The surgery was deemed successful, and her doctor cleared her to return to work without limitations.  However, she still complains of constant pain in her foot and leg, and states that she cannot walk for any distance or stand for any length of time.  Later, her doctor diagnosed carpal tunnel syndrome, which prevented her from wringing out rags at work without pain.  She underwent carpal tunnel release surgery.  However, she maintains that the surgery did not relieve her pain.  Additionally, she suffers from arthritis in her thumbs.

Howard also complains of depression.  Her doctor diagnosed dysthymia, prescribed antidepressants, and recommended follow-up treatment at the local mental health center.  Howard reported that the antidepressants relieved her symptoms; she requested a release to return to work without limitations.

Dr. Juan Aquino, Ph.D., performed a psychological evaluation and administered the Wechsler Adult Intelligence Scale – Revised (WAIS-R).  Howard obtained a verbal IQ score of 71, a performance IQ of 79, and a full scale IQ of 74.  Dr. Aquino

---

[2]The Honorable Judge Charles E. Wolle, District Judge for the Southern District of Iowa.

determined that Howard was "capable of performing simple instructions and procedures despite borderline to deficient attention/concentration and borderline IQ which may result in her pace being somewhat slow." He did not specifically test her ability to read.

Howard claims that she is illiterate. At her hearing, she testified that she reached the 6th or 7th, or possibly 9th, grade, but left school at age 14. She did pass the CNA licensing exam, but claims it was read to her. She has a driver's license, for which she had to pass a written exam; there is no evidence as to whether the exam was read to her or whether she was able to read it on her own. One intelligence test placed her at a 2nd grade level. No medical or psychological evaluator has found her to be illiterate. However, the record indicates that she is taking classes to learn to read. The ALJ concluded that she has a 9th grade education, which is defined as a "limited education." 20 C.F.R. §§ 404.1564 & 416.964.

Based on reports from state agency medical consultants who reviewed the record, the ALJ concluded that Howard has the residual functioning capacity (RFC) to perform

> light work activities which do not require lifting and carrying objects which weigh more than 20 pounds occasionally and 10 pounds frequently, standing or walking more than 2 hours without a break, or sitting more than 6 hours in an 8 hour day. The claimant is also limited in her ability to operate foot controls or to climb and can only occasionally wring out rags. In addition, the claimant is only capable of performing simple, routine, repetitive work.

The ALJ then heard testimony from a vocational expert, who testified that Howard would not be able to resume her work as a CNA. When posed a hypothetical question as to whether a person with the above-quoted RFC, age, education, and work experience could find work, the vocational expert (VE) opined that such a person could

-3-

perform the work of a dining room attendant, a housekeeper/cleaner, a laundry worker, or a hand packager, and that those jobs were available both nationally and in Iowa. The VE also testified that, even with limitations on wringing out rags and grasping items, Howard could still find work as a laundry worker.

The ALJ concluded that Howard was not disabled as defined by the Social Security Act. Howard appealed the decision to the Appeals Council of the SSA, which determined that there was no basis for granting review. Thus, the ALJ's decision stands as the final decision of the Commissioner of Social Security. Howard then sued the Commissioner in district court. The district judge rejected her specific contentions and affirmed the AJL's decision. She now appeals.

On review, Howard makes four claims of error: (1) the ALJ failed to require the Commissioner to provide objective medical evidence that supports an RFC to perform other kinds of work at step 5 of the disability determination; (2) the ALJ failed to take account of his own findings of fact in posing a hypothetical to the vocational expert; (3) the ALJ should have found Howard to be mentally retarded and thus disabled under the regulations; and (4) given Howard's educational level and physical disabilities, the ALJ should have found that the guidelines support a determination that she is disabled.

II

We review decisions of the Commissioner using the same standard as the district court. Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). By statute, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). We have stated that

> [w]e will uphold the Commissioner's determinations if they are supported
> by substantial evidence on the record as a whole. Substantial evidence is
> relevant evidence which a reasonable mind would accept as adequate to

-4-

support the Commissioner's conclusion. In assessing the substantiality of the evidence, we must consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. We may not reverse the Commissioner merely because substantial evidence exists supporting a different outcome.

Black v. Apfel, 143 F.3d 383, 385 (8th Cir. 1998) (internal quotations and citations omitted).

We defer heavily to the findings and conclusions of the SSA. "If, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits." Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996) (citing Siemers v. Shalala, 47 F.3d 299, 301 (8th Cir. 1995)).

III

The SSA has established a 5-step sequential evaluation process for determining disability. 20 C.F.R. §§ 404.1520 & 416.920. In step 5, the burden is on the Commissioner to determine, either by applying a standard set of vocational guidelines or by taking testimony from a vocational expert, that there are jobs available in the national economy that the claimant could perform. Id. Howard contends that the ALJ failed to hold the Commissioner to the burden of providing objective medical evidence that supports an RFC to perform other kinds of work.

This court has considered and rejected Howard's argument that additional medical evidence must be produced at step 5. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995). In Anderson we noted that

[i]t was the ALJ's responsibility to determine Anderson's RFC based on all the relevant evidence, including medical records, observations of

-5-

treating physicians and others, and Anderson's own description of her limitations. 20 C.F.R. §§ 404.1545-46, 416.945-46. We must determine whether the record presents medical evidence of Anderson's RFC at the time of the hearing. Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995). If there is no such evidence, the ALJ's decision "cannot be said to be supported by substantial evidence." Id.

The need for medical evidence, however, does not require the Secretary to produce additional evidence not already within the record. "[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994).

Id. Since there was already sufficient medical evidence in the record to support the ALJ's decision, the Commissioner was not required to produce additional medical evidence at step 5.

IV

Howard next contends that the ALJ's findings of borderline intellectual functioning and dysthymia, and his determination that Howard often experienced deficiencies of concentration, persistence or pace, were not adequately presented to the vocational expert in the ALJ's hypothetical. The ALJ asked the vocational expert to assume that Howard would be capable of performing simple, routine, repetitive tasks. Howard contends that this is reversible error.

"A hypothetical question must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant." Newton v. Chater, 92 F.3d 688, 694-95 (8th Cir. 1996). Testimony from a vocational expert based on a properly-phrased hypothetical constitutes substantial evidence. Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996). The converse is also true. See Newton,

92 F.3d at 695.  However, "[w]hile the hypothetical question must set forth all the claimant's impairments, [citation omitted], it need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments."  Roe, 92 F.3d at 676.

The ALJ's hypothetical assumed that Howard was able to do simple, routine, repetitive work.  All versions of the hypothetical assumed this mental capacity, and no additional details were brought out on direct or cross examination. We find that describing her as capable of doing simple work adequately accounts for the finding of borderline intellectual functioning.  The diagnosis of dysthymia was properly excluded from the hypothetical because it was being successfully treated by antidepressants and Howard made no further complaints about it.

The State agency psychological consultant described Howard as often having deficiencies of concentration, persistence or pace.  This portion of the consultant's opinion is described as "the medical severity of her condition, not a functional capacity evaluation."  ALJ's Decision, p. 8.   The functional capacity assessment, prepared by the same doctor on the same day, describes Howard as being "able to sustain sufficient concentration and attention to perform at least simple, repetitive, and routine cognitive activity without severe restriction of function."  Id. at 8-9.  Based on this record, the ALJ's hypothetical concerning someone who is capable of doing simple, repetitive, routine tasks adequately captures Howard's deficiencies in concentration, persistence or pace.  See Brachtel v. Apfel, 132 F.3d 417, 421 (8th Cir. 1997) (holding that hypothetical including the "ability to do only simple routine repetitive work, which does not require close attention to detail" sufficiently describes deficiencies of concentration, persistence or pace.)

## V

Howard also requests this court to take cognizance of the SSA's regulations at 20 C.F.R. § 404, Subpt. P, App. 1, § 12.05, entitled *Mental Retardation and Autism.* The psychological consultant found Howard's borderline intellectual functioning to be some evidence of mental retardation. Her IQ was determined to be 71. Howard claims she should be allowed the benefit of the mental retardation categorization.

Pursuant to SSA regulations, if a claimant is found to "have an impairment(s) which meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment(s), [SSA] will find [the claimant] disabled without considering [the claimant's] age, education, and work experience." 20 C.F.R. § 404.1520(d). Appendix 1 § 12.05 lists the criteria which establish mental retardation or autism. Howard claims her mental capabilities should be considered the equal of those described in section 12.05C, "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation or function." 20 C.F.R. § 404, Subpt. P, App. 1, § 12.05C.

We have held that where a claimant's IQ score does not fall within the range given in 12.05C, but is slightly above that range, the ALJ's determination that the claimant is not mentally retarded is supported by substantial evidence. Cockerham v. Sullivan, 895 F.2d 492, 496 (8th Cir. 1990). Thus, we must reject Howard's argument.

## VI

Finally, Howard contends that the ALJ incorrectly determined that the medical-vocational guidelines supported a finding of "not disabled." At step 5, in making a final determination as to disability, an ALJ first looks to the Tables or "grids" set forth in Appendix 2 to Subpart P. However, pursuant to the regulations,

where an individual has an impairment or combination of impairments resulting in both strength limitations and nonexertional limitations, the rules in this subpart are considered in determining first whether a finding of disabled may be possible based on the strength limitations alone and, if not, the rule(s) reflecting the individual's maximum residual strength capabilities, age, education, and work experience provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations.

20 C.F.R. § 404, Subpt. P, App. 2, § 2.00(e)(2). In Howard's case, the ALJ determined that "the medical-vocational guidelines set out in 20 C.F.R. 404, Subpt. P, App. 2, specifically Rules 202.10 and 202.17, provide a framework for a finding of not disabled." ALJ's Decision 15. By including in the RFC the qualification that Howard is only capable of performing simple, routine, repetitive tasks, the ALJ properly accounted for her borderline intellectual functioning, a nonexertional impairment. See Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997) ("We have previously concluded that borderline intellectual functioning, if supported by the record as it is here, is a significant nonexertional impairment").

Howard argues that the ALJ considered the wrong guidelines because he looked to the "grid" applicable to those capable of performing "light work." Howard contests the conclusion that she can do "light work," and claims that she can do only "sedentary work." The guidelines indicate a finding of *not disabled* for someone capable of performing "light work," who is closely approaching advanced age, who has a limited education, and whose previous work was unskilled. 20 C.F.R. § 404, Subpt. P, App. 2, § 202.10. However, the guidelines support a finding of *disabled* for someone capable of performing only "sedentary work," but who shares all the other characteristics above. 20 C.F.R. § 404, Subpt. P, App. 2, § 201.09. Essentially, Howard contests the ALJ's determination that she can do "light work."

We find substantial evidence in the record as a whole to support the ALJ's conclusion that Howard is capable of "light work." The medical information establishes that both surgeries, on her leg and on her hand, were successful and that she was released to work without limitations. The ALJ determined that her subjective testimony of pain was not credible, due to inconsistencies in the record as a whole.[3] See Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999) (citing factors to consider when analyzing a claimant's subjective complaints of pain and affirming ALJ's conclusion that Gray's limitations were not supported by the record as a whole). Even so, the ALJ has taken some account of her physical problems, and therefore placed limitations on her standing, walking, and lifting abilities. Finally, the ALJ accounted for the subjective pain from her carpal tunnel syndrome by stating that she could only occasionally wring out rags.

Howard also contends that she is illiterate. If this is accurate, the guidelines would support a finding of disabled even on the "grid" for "light work." 20 C.F.R. § 404, Subpt. P, App. 2, § 201.09. As noted above, even if an individual has a combination of both exertional and nonexertional limitations, a finding of disabled may be reached using the "grids" if the individual's exertional limitations alone dictate such a finding. 20 C.F.R. § 404, Subpt. P, App. 2, § 2.00(e)(2). Thus, if Howard could show that she is in fact illiterate, she would be entitled to a finding of disabled based solely on her exertional limitations. See Cunningham v. Apfel, 222 F.3d 496, 503 n.10 (8th Cir. 2000) ("Consideration of Cunningham's nonexertional limitations such as pain would only fortify the conclusion that she is disabled.").

---

[3]For instance, Howard's testimony is inconsistent about whether she worked after her onset date and about other aspects of her work history. Additionally, she is inconsistent in describing her job duties as a CNA, and in describing her daily activities. She also testified that her doctor told her to elevate her feet; however, the medical records contain no mention of a doctor having told her to do so.

The ALJ rejected Howard's claim of illiteracy. Although the ALJ commented that "there is no real evidence in the file to support her statement," ALJ's Decision 12, the record contains evidence of both literacy and illiteracy. Howard testified that she required assistance on her nursing exam, and that the test was read to her. The record also shows that at least one intelligence test placed Howard at only a second-grade level, a level at which a person would not be expected to read well, if at all. Although the ALJ found that Howard completed the 9th grade, the agency's own regulations recognize that "the numerical grade level that you completed in school may not represent your actual educational abilities." 20 C.F.R. § 404.1564(b). Howard received low or failing grades in school, and it appears that reading was an especially difficult subject for her. Finally, Howard was enrolled in reading classes at the time she sought disability benefits.

On the opposite side of the balance are several facts that suggest that Howard can read. She passed a driver's test which ostensibly requires an applicant to complete a written exam. Howard did not testify that the driver's exam was read to her, and no evidence suggests that the Howard passed the exam without reading the questions on her own. In addition, the ALJ found that Howard left school after the 9th grade. Although some 9th graders may be functionally illiterate, the more common inference is that persons with nine years of public education possess some ability to read. Cf. 20 C.F.R. § 404.1564(b)(1) (noting that "[g]enerally, an illiterate person has had little or no formal schooling."). Howard contests the ALJ's finding that she completed the 9th grade, but her evidence to the contrary is extraordinarily weak (and perhaps internally inconsistent) and was apparently discounted by the ALJ. Moreover, although Dr. Aquino found that Howard had borderline intellectual functioning, he made no mention that she was illiterate. ALJ's Decision 12.

The ALJ ultimately concluded that Howard could read. Because the literacy question is crucial, the ALJ should have developed a stronger record on this point. See Wilcutts v. Apfel, 143 F.3d 1134, 1137-38 (8th Cir. 1998) (noting that the ALJ has the

duty to fully and fairly develop the record and listing tests which could be administered to determine literacy). In the final analysis, however, the ALJ's failure to develop more robust proof of literacy (or illiteracy) is not fatal to the Commissioner's decision. The administrative record contains evidence pointing to Howard's ability to read, and, given our deferential standard of review, see Mapes, 82 F.3d at 262, we deem the evidence sufficient to support the ALJ's conclusion that Howard is functionally literate. Therefore, we find that she cannot benefit from 20 C.F.R. § 404, Subpt. P, App. 2, § 201.09. Rather, we affirm the ALJ's determination that 20 C.F.R. § 404, Subpt. P, App. 2, § 201.10 supports a finding of "not disabled."

VII

For the reasons stated above, we affirm the decision of the district court.

HEANEY, Circuit Judge, dissenting.

Victoria Howard, a black female, was born on December 23, 1947. She has fifteen children and fifty-four grandchildren. Her husband and a son are in prison. Five of her children lived with her at the time of the hearing; two were teenagers and three were younger. All five have been diagnosed with attention deficit hyperactivity disorder.

Howard dropped out of school at age fourteen due to her first pregnancy. She has, at most, a ninth-grade education, but tested at only the second-grade level. Howard testified that she was unable to read. Her criminal history includes six to seven assaults, the last of which occurred in the summer of 1996.

Howard was referred to Dr. Juan Aquino for a psychological evaluation. On December 10, 1996, he reported:

The client was administered the Wecshler [sic] Adult Intelligence Scale-Revised. She obtained a verbal IQ score of 71, a performance IQ score of 79, and a full scale IQ score of 74 on the WAIS-R. These scores place her abilities in the borderline range of intellectual functioning. General fund of knowledge, attention/concentration, visual perception, planning/sequential ability following social cues, visual-spatial abilities, and psychomotor speed/sustained attention were all borderline. Mental calculations, common sense reasoning, and abstract/associative thinking were deficient.

(Admin. Tr. at 308.) His findings included the following:

Attention/concentration is borderline to deficient, as evidenced by relevant subtests from the WAIS-R. Given her borderline IQ, pace will be somewhat slow. Although she may not have difficulties with simple instructions and procedures, difficulties may increase as these procedures and instructions become more abstract or detailed. However, by history, we know that she certainly is capable cognitively of performing CNA duties. Her judgment and ability to interact appropriately may be a source of concern given her history of assaultive behaviors.

(Id. at 309.) The ALJ found that Howard has the following severe impairments: "status post aorta femoral bypass surgery, degenerative joint disease of both thumbs, status post carpal tunnel release, borderline intellectual functioning, and dysthymia." (Id. at 19.) It is conceded that Howard is not able to return to her past work as a certified nurses' assistant.

There are several reasons why I believe that we have no alternative but to reverse and remand this matter to the Commissioner:

1. The hypotheticals posed by the ALJ to the vocational expert did not include a complete and accurate statement as to Howard's dysthymia and borderline intellectual functioning, and the fact she would often experience deficiencies of concentration,

persistence of pace resulting in the failure to complete tasks in a timely manner in a work setting or elsewhere, nor did it include any reference to her assaultive conduct. The hypotheticals read as follows:

> Q  [A]ssume that . . . the claimant is able to lift up to 20 pounds maximum, 10 pounds frequently, that she was able to do simple, routine, repetitive work.  That following her leg surgery she was prevented from doing any prolonged walking.  That means more than two hours on her feet without a break.  She should also be limited as to operation of foot controls and also limited in the amount of climbing needed.
>
> . . . .
>
> Q  . . . With these limitations would the claimant have been able to return to the past job as nursing assistant?
>
> A  No, she would not be able to perform her past work.
>
> Q  . . . Would that job have given her any skills as she performed it that could be used in other work activity under the hypothetical question?
>
> A  No, those lower level skills do not transfer.
>
> Q  And taking into consideration that the claimant was a – is still actually a younger individual who is functionally illiterate,[4] having a less than ninth grade education, but has the training and certification as a CNA that she utilized in her work activity.  Would there be unskilled work that she could perform?
>
> A  Yes, according to this hypothetical she would be able to perform work as a dining room attendant.  Food service of course, and that would

---

[4]A "functional illiterate" is defined as "[o]ne with some education but below a minimum literacy standard."  Webster's II New Riverside University Dictionary (1984).

be 311.69 – excuse me, 311.677-018. There's estimated to be 1,200 in Iowa and 90,000 in the United States. There would also be work in housekeeping as a cleaner. DOT code 323.687-014. There's estimated to be 2,000 in Iowa and 200,000 in the United States. These jobs are all by the way, light and unskilled. There would also be work in the laundry. DOT code 361.685-014. There's estimated to be 700 in Iowa and 45,000 in the United States. There would be jobs as a hand packager. The DOT code is 929.587-010. The majority of these jobs are, are in the medium capacity. However, these – this number that I give you are those that are found to be in the light capacity. There would be 3,000 in Iowa and 180,000 In the United States.

(Admin. Tr. at 80-82 (emphasis added).)

Howard testified she is unable to read. The ALJ rejects this testimony for the reason that she was able to take and pass a CNA examination and a written examination to obtain a driver's license. He rejects without any supporting evidence her testimony that she was able to pass the CNA examination because it was read to her. As to the driver's license examination, he is obviously unfamiliar with the Iowa practice which provides a computer at each testing station that reads the test out loud to any person who requests it. If the ALJ were fulfilling his responsibility, he would have questioned Howard as to how she was able to pass the driver's license examination if she could not read instead of assuming she was not telling the truth about her reading ability.

2. Even if one assumes that the hypotheticals were complete and that a functional illiterate can be found capable of performing light work, it is clear that Howard is not able to perform the duties of house cleaner, 323.687-014; laundry worker, 361.685-014; and hand packager, 929.587-010, each of which were classified as light work. A person employed in these positions is expected to carry out detailed written instructions; add and subtract two-digit numbers; multiply and divide tens and hundreds by two, three, four, and five; perform operations with units such as a cup,

-15-

pint, and quart; inch, foot, and yard; and ounce and pound; read at the rate of 95-120 words per minute; and print simple sentences containing a subject, verb, and object and a series of numbers, names, and addresses. See Dictionary of Occupational Titles, 1011 (4th ed. 1991). There is absolutely no evidence in the record that she meets any of these requirements. Nor is there evidence to indicate that a functional illiterate could meet these requirements.

3. The position of dining room attendant that the vocational expert indicated Howard could perform requires medium strength, which the record clearly indicates Howard does not possess.

4. The ALJ found that Howard was not credible with respect to her subjective complaints of pain and resulting functional limitations because her daily activities indicated she was able to work. The testimony indicates that Howard only does light cleaning, such as dusting, she watches television, and is driven to where she needs to go by her two oldest daughters, her children help her fold and put away laundry, cook for her, do outdoor chores, and run errands. (Admin. Tr. at 25.)

These activities certainly do not indicate an ability to work "in the sometimes competitive and stressful conditions in which real people work in the real world." McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc). In Baumgarten v. Chater, 75 F.3d 366, 369 (8th Cir. 1996), we reiterated that "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work," (quoting Hogg v. Shalala, 45 F.3d 276, 278 (8th Cir. 1995)). This standard has correctly been applied by this court in numerous other cases. See Rainey v. Department of Health & Human Servs., 48 F.3d 292, 293 (8th Cir. 1995), (holding that heating food, visiting relatives, and watching television were "activities we have held are not substantial evidence of the ability to do full-time work."); Kouril v. Bowen, 912 F.2d 971, 976 (8th Cir. 1990) (stating that "[d]isability does not require total incapacity. It requires that an individual

-16-

be unable to engage in substantial gainful activity."); <u>Cline v. Sullivan</u>, 939 F.2d 560, 565 (8th Cir. 1991) (holding that claimant's "ability merely to perform the limited service of pouring coffee or removing the excess plates from a table on an occasional basis does not compel a conclusion that a claimant is capable of performing the full range of sedentary work on a sustained basis."); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989) (stating that claimant's "ability to do light housework with assistance, attend church, or visit with friends on the phone does not qualify as the ability to do substantial gainful activity."); <u>Easter v. Bowen</u>, 867 F.2d 1128, 1130 (8th Cir. 1989) (holding that "[a]n applicant need not be completely bedridden or unable to perform any household chores to be considered disabled.").

In summary, there clearly is not substantial evidence in the record to support the ALJ's conclusion that Howard is capable of light work. In my view, the record rather supports Howard's claim that she is entitled to disability benefits. At the very least, Howard is entitled to a remand and an additional evidentiary hearing at which a proper hypothetical would be posed to the vocational expert, and any doubt as to Howard's literacy would be eliminated. It is wrong to deny a person benefits if a short additional hearing would more than likely establish her eligibility.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.