# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 04-1358

———————

| | |
|---|---|
| Tawanna Neal, by her next friend, Evelyn M. Walker, | * * * |
| Appellants, | * |
| v. | * Appeal from the United States<br>* District Court for the<br>* Southern District of Iowa. |
| Jo Anne B. Barnhart, Commissioner of Social Security, | * * |
| Appellee. | * * |

———————

Submitted: November 19, 2004
Filed: April 27, 2005

———————

Before SMITH, BEAM, and BENTON, Circuit Judges.

———————

SMITH, Circuit Judge.

### I. *Introduction*

Evelyn Walker ("Walker"), on behalf of her daughter, Tawanna Neal ("Neal"), appeals the Commissioner's denial of supplemental security income ("SSI") benefits made under Title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq., after Neal

was found to be no longer disabled. The district court[1] found that substantial evidence supported the decision of the Commissioner. We affirm.

## II. *Background*

Walker filed an initial application for SSI benefits for Neal under Title XVI on September 5, 1995, and alleged a disability onset date of October 10, 1989. Neal alleged disability due to a mental impairment that resulted in an inability to follow directions, slow learning, and slow developmental skills. The medical record supported a finding of disability. Dr. Stana J. Michael ("Dr. Michael"), Ed.D., administered the Wechsler Intelligence Scale for Children-Third Edition (WISC-III) in November 1995. Neal obtained a verbal intelligence quotient (IQ) score of 76, a performance IQ score of 58, and a full scale IQ score of 65. Dr. Michael diagnosed Neal with mild mental retardation based on those scores. However, Dr. Michael opined that Neal's scores were low indications of her abilities and noted that Neal's verbal IQ score was within the borderline intellectual functioning range. Dr. Michael also observed that Neal's "performance score was much weaker and in this area she tended to give up rather easily."

The Commissioner reviewed Neal's continued eligibility for benefits in 1997 following enactment of 42 U.S.C. § 1382c(a)(3)(C)(i) which created new standards describing qualifying disabling conditions. Neal missed an assigned consultative examination and the Commissioner terminated her benefits. After filing requests for reconsideration, a hearing was held with a disability hearing officer, who determined that Neal's disability had ceased. Following a hearing, an administrative law judge ("ALJ") ruled that Neal was not under a "disability" as defined in the Social Security Act and the Appeals Council denied a request for review.

---

[1]The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa.

During the administrative hearing, Walker testified that Neal went to bed and arose on her own and ate breakfast without assistance. While Neal sometimes required help buttoning her clothing and styling her hair, Neal showered and dressed herself without assistance. Neal also rode the bus both to and from school on her own. Walker testified that Neal earned an "A" in her regular physical education class, enjoyed art, and performed well at drawing–which she spent a considerable amount of time doing. However, Neal was unable to ride a bicycle or cook when unattended. Neal's grandmother, Bessie Johnson ("Johnson"), also testified on Neal's behalf. Johnson testified that Neal had once jumped into the deep end of a pool and required assistance due to her inability to swim.

Dr. Roger L. Parks ("Dr. Parks"), Psy.D., administered the WISC-III to Neal on December 12, 1997. Neal obtained a verbal IQ score of 46, a performance IQ score of 49, and a full scale IQ score of 45. Dr. Parks opined that those scores did not accurately reflect Neal's cognitive abilities. Dr. Parks stated that Neal was cooperative, but not sufficiently motivated during the administration of the WISC-III. According to Dr. Parks, Neal gave up easily on difficult items and may have intentionally given up on more simple items. Dr. Parks also diagnosed Neal with mild mental retardation because, based on the statements of Neal's mother, he suspected that Neal's cognitive abilities fell within the mentally deficient range.

Neal's special education teacher, Jeanie Wade ("Wade"), completed a school activities questionnaire on September 30, 1998. Wade stated Neal had good motor and communication skills, although Neal sometimes did not understand directions or ask for help. Neal's school psychologist, Sally Hartman ("Hartman"), performed a psychological assessment of Neal in April 1999, which included another WISC-III examination. The results of the WISC-III showed a full scale IQ score of 72, a verbal IQ score of 82, and a performance IQ score of 66. Hartman opined that Neal functioned within the low average range intellectually.

At the request of Neal's attorney, Dr. James A. Stehbens ("Dr. Stehbens"), Ph.D., a pediatric psychologist, performed a consultative psychological evaluation on February 26, 2001. The results of that evaluation revealed verbal and nonverbal IQ scores within the borderline range of intelligence. Dr. Stehbens diagnosed Neal with borderline intelligence and school learning delays.

On April 12, 2001, Dianne McBrien ("Dr. McBrien"), M.D., diagnosed Neal as a healthy child with borderline intelligence and learning disabilities. Dr. McBrien recommended that Neal continue with educational and psychological assistance.

Finally, Kris Baldwin ("Baldwin"), M.P.T., a physical therapist, evaluated Neal on April 12, 2001. Baldwin conducted an assessment of Neal's motor status, and opined that Neal had delays in her gross motor skills, but that she was functional in her environment and had good leg strength and normal range of leg motion. Baldwin stated that Neal's strongest area was bilateral coordination and that she was most challenged by activities that required balance and spatial awareness of her body. Baldwin stated Neal's gross motor skills could be improved with specific activities that challenged her balance, such as riding a bicycle and roller skating, although she would require large amounts of practice to learn how to do these activities. Neal was found to have very legible writing and it was suggested that an adjustment of her pencil grip would reduce pressure in her hand from writing. Neal was able to use a computer keyboard for her school work.

The ALJ found Neal had borderline intellectual functioning and a learning disability. However, the ALJ further found that Neal's limited mental functioning did not meet or medically or functionally equal the requirements for the Listing of Impairments. According to the ALJ, Neal had neither subaverage general intellectual functioning nor deficits in adaptive functioning. While the ALJ found that Neal had a marked impairment in acquiring and using information, Neal showed less than a marked impairment in moving about and manipulating objects, and had no limitation

in attending and completing tasks, interacting and relating with others, caring for herself, her health or her well-being. The district court found that substantial evidence supported this decision and affirmed the ALJ.

### III. *Discussion*

We review decisions of the Commissioner using the same standard as the district court. *Howard v. Massanari*, 255 F.3d 577, 580–81 (8th Cir. 2001). By statute, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). We have stated that

> the Commissioner's determinations [will be upheld] if they are supported by substantial evidence on the record as a whole. Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion. In assessing the substantiality of the evidence, we must consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. We may not reverse the Commissioner merely because substantial evidence exists supporting a different outcome.

*Black v. Apfel*, 143 F.3d 383, 385 (8th Cir. 1998) (internal quotations and citations omitted). Substantial evidence is more than a scintilla of evidence. *Nelson v. Sullivan*, 966 F.2d 363, 366 n.6 (8th Cir. 1992). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197 (1938)). Under this standard, we do not reverse the Secretary even if we, sitting as finder of fact, would have reached a contrary result; "[a]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler,* 730 F.2d 1147, 1150–51 (8th Cir. 1984). We defer heavily to the findings and conclusions of the Social Security Administration. *Howard*, 255 F.3d at 580–581. We may also reverse the Commissioner's findings if

the Secretary applies an erroneous legal standard. *Ingram v. Chater*, 107 F.3d 598, 601 (8th Cir. 1997).

We apply a three-step analysis to childhood disability determinations. *Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853, 854 (8th Cir. 2003). *See also* 20 C.F.R. § 416.924(a). We first determine whether the child is engaged in substantial gainful activity. 20 C.F.R. § 416.924(b). The second step requires a determination of whether the child's impairments are "severe." 20 C.F.R. § 416.924(c). Under this step, if the impairments result in no more than minimal functional limitations, the impairments are not severe and the child is not disabled. The third step requires a determination of whether the child's impairments meet, are medically equal, or are functionally equal in severity to the listed impairments set forth in the Commissioner's disability regulations, 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 416.924(d). A child's impairment is medically equal to a listed impairment if it is at least equal in severity and duration to the medical criteria of the listed impairment. 20 C.F.R. § 416.926(a). A child's impairment is functionally equal to a listed impairment if there is an "extreme" limitation in one of six specific functional domains, or a "marked" limitation in at least two domains. 20 C.F.R. § 416.926a. Domain analysis considers the child's age-appropriate functioning in relation to: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving around and manipulating objects; (5) caring for oneself; and (6) health and physical well being. 20 C.F.R. § 416.926a(a)(1)(i)–(vi).

Here, the ALJ determined that Neal met the requirements of steps one and two. Neal never engaged in substantial gainful activity and her borderline intellectual functioning and learning disability were severe impairments. However, at step three, the ALJ found that Neal's impairments neither met nor were medically or functionally equal to the requirements of the Listing of Impairments as described in 20 C.F.R. § 404, Subpart P, Appendix 1. Neal argued that her disabilities either met or were medically or functionally equal to mental retardation as listed in § 112.05, specifically

subsection F. The ALJ ruled that Neal did not meet or medically equal § 112.05 because the most recent test results indicated that she had borderline intelligence, not mental retardation. Moreover, the ALJ ruled that Neal's test scores did not satisfy any of the subsections of § 112.05.

The mental retardation listing contained in § 112.05 describes mental retardation as "characterized by significantly subaverage general intellectual functioning with deficits in adaptive function." The required level of severity for this disorder is satisfied when the requirements of any one of the six subsections are met. While several of the six subsections have a specific IQ requirement, the applicable subsection in this case, § 112.05F, does not. Instead, § 112.05F requires, for children aged 3 to 18, "satisfaction of [§] 112.02B(2)(a), and a physical or other mental impairment imposing an additional and significant limitation of function." Section 112.02B(2)(a) sets forth a requirement of

> [m]arked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication.

Neal's intelligence ranged between borderline intellectual functioning and mild mental retardation. When tested by Dr. Michael in 1995, Neal obtained a verbal IQ score of 76, a performance IQ score of 58, and a full scale IQ score of 65. Based on Neal's overall score, Dr. Michael's actual diagnosis was mild mental retardation. However, Dr. Michael opined that Neal's scores were low indications of her ability. In 1997, Dr. Parks also diagnosed Neal with mild mental retardation. During that examination, Neal obtained a verbal IQ score of 46, a performance IQ score of 49, and a full scale IQ score of 45. Dr. Parks agreed with Dr. Michael's analysis that the

scores "underestimate her cognitive functioning" and "do not reflect an accurate appraisal of Neal's abilities." Both Dr. Stehbens and Dr. McBrien examined Neal in 2001 and both diagnosed her with borderline intelligence and learning disabilities or delays. Neal's latest IQ was administered in April 1999. The results of that exam showed a full scale IQ score of 72, a verbal IQ score of 82, and a performance IQ score of 66.

Neal argues that the ALJ heavily relied upon the April 1999 IQ scores and the diagnoses of borderline intelligence made by Dr. Stehbens and Dr. McBrien. In doing so, argues Neal, the ALJ improperly disregarded the earlier diagnoses of mental retardation made by Dr. Michael and Dr. Parks and, in effect, gave Neal credit for more than what she was able to do. Neal ignores that both Dr. Parks's and Dr. Michael's diagnoses of mild mental retardation were only based on her IQ scores. Both doctors opined that those scores were not accurate reflections of her intelligence level or cognitive ability. Substantial evidence supports the ALJ's finding that Neal's impairments did not medically equal § 112.05F.

Substantial evidence also supports the ALJ's finding that Neal's impairments did not functionally equal § 112.05F. The ALJ ruled that Neal did not have any extreme limitations and only a marked limitation in acquiring and using information. Neal argues that she also has marked limitations in moving around and in manipulating objects and caring for herself. In 2000, Neal was assigned to regular physical education classes, in which she earned an A grade. Moreover, a physical therapist examined Neal's motor skills in 2001 and concluded that although there were delays in Neal's gross motor skills, Neal had good leg strength, a normal range of leg motion, and was functional in her environment. While Neal had been having some difficulty in learning to ride a bicycle, specialists have suggested that she is capable of learning to ride a bicycle and roller skate with practice. There was also substantial evidence in the record that Neal was able to draw, sketch, write legibly, and use a computer keyboard. Neal's mother testified that Neal had no personal

mobility problems and that teachers observed Neal to have good motor skills. While Neal could not cook or swim without supervision, those inabilities alone do not establish that Neal was markedly limited in caring for herself. School records did not indicate that Neal had put herself at risk for physical injury. Neal is able to bathe and dress herself, although her mother does help her style her hair and selects her wardrobe.

The record reflects that Neal had difficulty comprehending certain information and verbal instructions. Testing in April 1999 indicated that Neal, then age eleven, functioned at a second grade level in reading and mathematics and at a first grade level in written language. Neal scored significantly below average on a visual-perceptual skill test. Neal's written language skills were also well below average. This evidence establishes, as found by the ALJ, that Neal had a marked limitation in acquiring and using information. However, one marked limitation is insufficient to show that Neal was functionally equal to § 112.05F. When the whole record is considered, we are left with the conclusion that the findings of the Commissioner are supported by substantial evidence. We must therefore affirm.

_____