# UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

———————

No. 09-3238

———————

Alfred L. Gragg,                          *
                                          *
            Appellant,                    *
                                          *      Appeal from the United States
      v.                                  *      District Court for the
                                          *      Western District of Missouri.
Michael J. Astrue, Commissioner of        *
Social Security,                          *
                                          *
            Appellee.                     *

———————

Submitted: June 18, 2010
Filed: August 9, 2010

———————

Before SMITH and HANSEN, Circuit Judges, and WEBBER,[1] District Judge.

———————

WEBBER, District Judge.

      Alfred L. Gragg appeals the judgment of the district court[2] upholding the Social Security Commissioner's denial of his application for disability insurance benefits and supplemental security income. This court affirms.

_____

      [1] The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri, sitting by designation.

      [2] The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

## I.

Alfred Gragg applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income under Title XVI of that Act, 42 U.S.C. § 1382. Gragg alleges a disability onset date of December 31, 2002.

In August of 2002, Gragg was injured at the auto salvage business where he was employed when he was pulling a part with a chain from underneath a car. He hit the back of his head, and then his head was knocked forward, and he hit his neck, back, head and shoulder on the bottom side of a forklift. The incident caused him to feel stunned for approximately fifteen minutes. On December 31, 2002, Gragg decided to stop working for the auto salvage business because he was experiencing overbearing pain, and the job required him to lift up to 250-275 pounds. Gragg stated that he later had a job removing and replacing transmissions, which only required him to lift 75-125 pounds. However, he only stayed at that job for five weeks because severe pain prevented him from getting all of his work done. Gragg has not sought employment since that time, and he has not sought services from a vocational rehabilitation agency because he cannot read or write.

An x-ray taken on January 27, 2003, of Gragg's cervical spine showed degenerative spondylotic changes of the mid cervical spine, congenital fusion of C2 and C3, and mild foraminal stenosis at the C3-C4 and C4-C5 levels on the right side. On February 10, 2003, Daniel M. Merck, M.D., conducted a physical examination of Gragg, and observed that he was "an awake, alert, oriented gentleman sitting in a chair in moderate discomfort." Dr. Merck noted that Gragg's neck was tender to palpation over the paracervical musculature and that he had decreased range of motion, strength, flexion, extension, and rotation of the neck secondary to pain. Dr. Merck's impression was that Gragg suffered from cervical radiculopathy, and he planned a series of

cervical steroid epidural injections and ordered an MRI scan of Gragg's cervical spine. The MRI was completed on February 13, 2003, and revealed congenital fusion of C2 and C3 vertebral bodies and mild right unco-facet hypertrophy at the C4-C5 level, resulting in mild right neural foraminal narrowing.

Through the remainder of 2003 and early 2004, Gragg visited with various healthcare providers, complaining of neck pain and other pain. He noticed some improvement after receiving an epidural injection and after completing physical therapy. The medical records from this period did not mention any mental, psychiatric, or cognitive problems.

In October of 2004, Gragg saw Jason Datta, M.D., at the orthopaedic clinic in Truman Medical Center. Gragg complained of pain in his neck and right shoulder, and Dr. Datta noted that Gragg had full range of motion of the neck with complaints of pain, and full range of motion of the right shoulder with pain to palpation. Dr. Datta ordered an MRI of the right shoulder, which revealed a small acromial spur and an intact rotator cuff, with mild tendinitis "at best." An MRI of the cervical spine showed a C4-C5 herniated disk, with some right foraminal stenosis, but no central stenosis or cord signal changes. The following month, an electromyography (EMG) study revealed that there were no neuropathic changes in the nerves and muscles tested. Nicholas Ahn, M.D., the orthopaedist who conducted the EMG study, noted that the EMG study was normal, and that Gragg may have C4 radiculopathy, "but right now it really does not bother him that much." Dr. Ahn noted that Gragg's MRI was questionable, and that performing a C3-C4 diskectomy was also questionable. Dr. Ahn recommended physical therapy and prescribed Celebrex and Flexeril.

In January of 2005, Gragg had a consultative medical examination with Stephen L. Hendler, M.D. Dr. Hendler noted that Gragg was not in distress and had intact cognitive function. He also noted that Gragg's neck flexion was full, extension was 45 degrees, and rotation was 70 degrees to the left and 70 degrees to the right, with

some tenderness bilaterally in the paraspinal musculature, just off the midline. Dr. Hendler diagnosed Gragg with cervical spondylosis with congenital fusion and impingement syndrome in the right shoulder. He commented that Gragg had no findings that would preclude him from performing six hours or more of standing or walking daily, but that overhead activity would potentially be difficult due to the combination of cervical spondylosis and impingement syndrome.

In July 2005, Gragg was evaluated by John Keough, M.A., a licensed psychologist. Mr. Keough observed that Gragg presented himself as being somewhat irritable and uncomfortable physically, placing a bag of ice in a handkerchief around his neck off and on throughout the interview. Mr. Keough noted that, other than being irritable, Gragg displayed no unusual gestures or mannerisms, but he appeared to be experiencing a mild to moderate level of anxiety, depression, and hostility. Mr. Keough concluded that: Gragg's ability to understand and remember instructions was mildly limited by learning disabilities; Gragg appeared to be experiencing a mild to moderate level of impairment with regard to his ability in sustaining concentration, being persistent in tasks, and maintaining an adequate pace in productive activity; and Gragg's ability to adapt to the environment of others appeared to be moderately limited by a mood disorder. Mr. Keough ultimately diagnosed Gragg with a learning disorder and indications of a mood disorder due to medical concerns, noting that his alleged limitations on his forms did not at all match his records. To support this conclusion, Mr. Keough noted that Gragg was on treatment for depression, but had no complaints at recent exams and no history of professional mental health treatment. Mr. Keough also explained that Gragg's physical complaints did not match the objective findings in his physical medical records.

On August 10, 2006, Gragg reported to Roger Wise, Psy.D., that he was not able to work due to physical problems and that his inability to support his family made him depressed. At a follow-up appointment one week later, Gragg reported to Dr. Wise that he was feeling better and was associating more with his family.

Upon request by the Missouri Division of Family Services, Gragg was evaluated by Holly Chatain, Psy.D., on August 30, 2006. Dr. Chatain observed that eye contact was infrequent and Gragg's mood was depressed and his affect was tearful and anxious throughout the clinical interview. She noted that Gragg appeared cooperative during the assessment process, but that he did not complete formal testing due to his inability to read. Dr. Chatain diagnosed Gragg with major depressive disorder, single episode, moderate, and concluded that Gragg's psychological functioning is impaired due to depression. Dr. Chatain assigned Gragg a Global Assessment Functioning (GAF) score of 55.

Upon request of his attorney, Gragg was evaluated by John Pro, M.D., on September 12, 2006. Dr. Pro administered the Revised Hamilton Ratings Scale for Depression to Gragg, which revealed that Gragg rated himself as seriously depressed. In other self-rating exams, Gragg rated his pain as severe in all areas of functioning, and his quality of life as very low due to the combination of his physical and mental health. Dr. Pro noted that Gragg could not read instructions or sentences, and that he could not write a sentence. Dr. Pro also observed that Gragg had some memory loss, but his recent memory was generally intact, and that although he had a limited vocabulary and difficulty with large words, Gragg was psychologically insightful about the way he felt. Dr. Pro opined that Gragg was suffering from major depressive disorder, aggravated by chronic pain syndrome with medical and psychological factors. He noted that Gragg is functionally illiterate, and that his injury in 2002 substantially aggravated his depression and was the prevailing cause of his chronic pain syndrome. Dr. Pro concluded that when Gragg's psychological impairment is combined with his orthopaedic impairment, he is "permanently and totally disabled" and that no employer would hire him given his physical and mental impairments and illiteracy. Dr. Pro assigned Gragg a GAF score of 50-51.

On November 8, 2006 and December 21, 2006, Gragg was evaluated by Kathleen J. Keenan, Ph.D. Dr. Keenan concluded that Gragg was suffering from

somatoform pain disorder, posttraumatic stress disorder, and a schizoid personality disorder with dependent personality features. She noted that the personality and posttraumatic stress disorders predated Gragg's injury, but they had a marked impact on the way he dealt with his injury. Dr. Keenan noted that Gragg deals with his emotional stress by over-focusing on and exaggerating his physical symptoms. She stated that Gragg's physical injuries are unlikely to be the primary reason that he claims he can no longer work. Dr. Keenan concluded by noting that Gragg's pre-existing personality and mental health issues interacted with his injury to "precipitate a vicious spiral of emotional, social, and physical disability." Dr. Keenan assigned Gragg a GAF score of 40.

An administrative hearing was held on September 18, 2006. At the hearing, Gragg testified that he lived with his wife, oldest son, and grand-nephew in Adrian, Missouri. He stated that he completed the ninth grade in special education classes, but he cannot write or read any words. He acknowledged that he can write his name, copy words, read numbers on road signs, and do some math. Gragg testified that he has trouble standing or sitting for long periods of time, he can only walk about a block before becoming fatigued, he can climb four or five stairs, and he can lift a little more than a gallon of milk. Gragg also testified that he has difficulty concentrating and staying focused. When asked about his daily activities, Gragg explained that he gets up at 6:30 or 7:00 a.m., goes to the restroom, brushes his teeth, has coffee, then awakens the rest of his family. Either he or his wife takes his grand-nephew to and from school. Gragg does not do any household chores or yard work, and he rarely runs errands. He said that he does not visit with family or friends, and he has no hobbies. He testified that he has to lay down for about three hours during the day because of his pain, but he does not have any trouble sleeping after taking pain medication. He also testified that he has problems getting along with other people because he has no patience and he gets upset easily. He said that he doesn't like himself, he cries a lot, and that he has had suicidal thoughts.

Dorothy Wolford, Gragg's mother-in-law, also testified at the administrative hearing. She stated that she lives next door to Gragg, and has known him for thirty-five years, and sees him everyday. She said that Gragg has changed in that he used to be happy-go-lucky, but he no longer laughs, jokes, and plays with the kids as he formerly did. Ms. Wolford testified that Gragg complains about how he feels and he no longer gets along with people.

A vocational expert testified at the administrative hearing. The ALJ asked the vocational expert to assume a hypothetical claimant of the same age, education, and work experience as Gragg, who can stand six to eight hours per day, sit six to eight hours per day, and can lift 20 pounds occasionally and 10 pounds frequently. The hypothetical claimant could reach up and get something on occasion, but the use of his arms above shoulder level should not be a regular job task. Additionally, the hypothetical claimant could not read or write, although he could identify and read symbols and single words that are repeated over and over, such as an instruction on/off, stop, pull or push, but as far as reading and writing any sentences or anything more than something simple, the hypothetical claimant could not do that. The hypothetical claimant also could add and subtract and perform simple tasks, but he could not have frequent public contact. In response, the vocational expert testified that the hypothetical claimant would be able to perform a range of work, including the jobs of sewing machine operator, shipping and receiving weigher, stuffer, and eyeglass polisher.

Following the administrative hearing, the ALJ determined that Gragg did not qualify as "disabled" under the Social Security Act, and denied Gragg's claim for disability insurance benefits and supplemental security income. In making this decision, the ALJ followed the five-step disability evaluation process set forth in 20 C.F.R. § 416.920. *See, e.g.*, *Ramirez v. Barnhart*, 292 F.3d 576, 580 (8th Cir. 2002). At step one, the ALJ concluded that Gragg has not engaged in substantial gainful activity since December 31, 2002, the alleged onset date of disability. At step two,

the ALJ determined that Gragg's mild degenerative disc and joint disease of the cervical spine, right shoulder impingement syndrome, history of back pain, affective disorder, and learning disorder were severe impairments that impose significant limitations upon his ability to perform basic work-related activities. However, at step three, the ALJ found that Gragg's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. At step four, the ALJ determined that Gragg had the following residual functional capacity:

> claimant retains the residual functional capacity to lift 20 pounds maximum occasionally and 10 pounds frequently. He is capable of occasionally reaching above shoulder level to obtain objects, but is limited to only rare use of his bilateral arms above shoulder level during regular performance of job tasks. He is capable of sitting or standing each 6-8 hours total throughout the course of a normal workday. He is precluded from reading or writing as a job task, but is capable of reading and identifying simple words such as on, off, stop, push, or pull. He is capable of reading and identifying numbers and performing basic addition and subtraction calculations. He is limited to performance of only simple job tasks. He is capable of maintaining adequate social interactions with supervisors or coworkers, but is restricted to job tasks not requiring frequent or prolonged contact with the general public.

Based on this RFC, the ALJ determined that Gragg was unable to perform his past relevant work. Finally, at step five, the ALJ found that, based on the testimony of the vocational expert, Gragg could perform jobs that exist in significant numbers within the regional and national economies. Thus, the ALJ found that Gragg was not "disabled," and denied his claim for disability insurance benefits and supplemental security income.

On August 22, 2007, after the administrative hearing and after the ALJ denied Gragg's claim for disability case, Gragg participated in a vocational evaluation performed by Mary Titterington, M.S. Ms. Titterington assessed Gragg's verbal IQ to be 93, his visual IQ to be 71, and his general IQ to be 80. She noted that these scores fall into the substantially below average range. Ms. Titterington concluded that in word reading, Gragg was at grade equivalent K.9; in sentence comprehension, he was at grade equivalent >K; in spelling, he was at grade equivalent 1.2; and in math computation, he was at grade equivalent 3.5. Gragg's score on the Reading Comprehension Test placed him at the sixteenth percentile and at grade equivalent third grade, eighth month. Gragg scored substantially below industrial standards on the Hand Tools Dexterity Test and below average on the Box and Blocks manual dexterity test. Ms. Titterington noted that Gragg does not know how to use a keyboard, and he is functionally illiterate, with academic skills at the early elementary school level. Ms. Titterington opined that Gragg was not a good candidate for vocational rehabilitation services, given his low total functioning level combined with his physical and emotional limitations. She concluded that Gragg was unemployable in the open labor market.

The Appeals Council of the Social Security Administration denied review of the ALJ's decision on October 24, 2008, resulting in a final decision of the Commissioner. *See Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008). Gragg then sought review by the United States District Court for the Western District of Missouri. The district court upheld the ALJ's opinion. Gragg now appeals, arguing that the Commissioner's decision to deny his claim for disability insurance benefits and supplemental security income is not supported by substantial evidence on the record as a whole. Specifically, Gragg asserts that the ALJ did not properly consider his borderline intellectual functioning in assessing his severe impairments and in positing the hypothetical question to the vocational expert.

II.

This court reviews *de novo* the district court's decision to uphold the denial of social security benefits, and will "affirm the ALJ's findings if they are supported by substantial evidence on the record as a whole." *Bowman v. Barnhart*, 310 F.3d 1080, 1083 (8th Cir. 2002). "Substantial evidence is 'less than a preponderance but is enough that a reasonable mind would find it adequate to support' the conclusion." *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004) (quoting *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002)). "'[T]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight. Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.'" *Heino v. Astrue*, 578 F.3d 873, 878 (8th Cir. 2009) (quoting *Jackson v. Bowen*, 873 F.2d 1111, 1113 (8th Cir. 1989)). "If substantial evidence supports the decision," this court "will not reverse, even if substantial evidence could have been marshaled in support of a different outcome." *England v. Astrue*, 490 F.3d 1017, 1019 (8th Cir. 2007).

In seeking review by the United States District Court for the Western District of Missouri, the sole challenge advanced by Gragg was that the ALJ did not properly consider his alleged borderline intellectual functioning. As noted by the district court, "while [Gragg] has discussed the Record at some length, he has not alleged any of the ALJ's findings regarding his physical capabilities or the effects of depression were erroneous." Because Gragg did not challenge any of these findings by the ALJ at the district court level, the issues are waived at the appellate level. Thus, to the extent Gragg raises these issues on appeal, this court will not consider them, as Gragg makes no showing that manifest injustice would otherwise result. *See Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir. 1997); *Novotny v. Chater*, 72 F.3d 669, 670 (8th Cir. 1995).

## A. Severe Impairment

Gragg first argues that the evidence established that he had been diagnosed with borderline intellectual functioning, and the ALJ erred in not considering the condition to be a severe impairment. In support of his argument, Gragg cites to the reports written by Mr. John Keough and Ms. Mary Titterington,[3] following their physical examinations of Gragg. While it is true that the ALJ did not specifically mention borderline intellectual functioning as a severe impairment, she did determine that Gragg had a combination of impairments that were "severe," and one of the listed impairments was a learning disorder. The reports of Mr. Keough and Ms. Titterington are entirely consistent with the ALJ's determination that Gragg had a learning disorder, and do not support Gragg's argument that they concluded borderline intellectual functioning was a severe impairment separate and apart from a learning disorder.

First, with respect to Mr. Keough's analysis of Gragg, the report does not utilize the term "borderline intellectual functioning," rather, Mr. Keough wrote,

> [b]ased on my findings during this interview and records reviewed, indications are that the claimant's ability to understand and remember instructions is mildly limited by learning disabilities. Mr. Gragg appears to be experiencing a mild to moderate level of impairment with regard

---

[3]Although Ms. Titterington's report was written after the ALJ denied Gragg's claim for disability benefits, it is still a part of the record because it was presented to the Appeals Council. *See Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000) ("The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision. . . . The newly submitted evidence thus becomes part of the 'administrative record,' even though the evidence was not originally included in the ALJ's record.").

to his ability in sustaining concentration, being persistent in tasks, and maintaining an adequate pace in productive activity.

Additionally, Mr. Keough's diagnostic impression was that Gragg suffered from a learning disorder, with indications of a mood disorder due to medical concerns. Nothing in Mr. Keough's report supports Gragg's assertion that Mr. Keough concluded that Gragg had borderline intellectual functioning; moreover, the ALJ's determination that Gragg suffered from a learning disorder is an accurate summary of Mr. Keough's findings.

The ALJ's findings were also consistent with Ms. Titterington's report. First, the court notes that Ms. Titterington did not specifically find that Gragg had borderline intellectual functioning, rather she noted that his scores on the Wide Range Intelligence Test placed him in the below average or slow learner category range of intellectual functioning. Moreover, she consistently noted that it was Gragg's learning disability, and not borderline intellectual functioning or IQ score, that was a factor affecting his employability. Ms. Titterington's report contained a thorough recitation of Gragg's medical history and the limitations that his physical and mental impairments imposed upon him. These limitations were entirely consistent with the limitations considered by the ALJ. As noted by the district court, the limitations considered by the ALJ were sufficient because "(1) Ms. Titterington did not suggest any additional limitations on [Gragg]'s abilities, and (2) [Gragg] does not suggest any additional limitations that should have been included in the ALJ's hypothetical." Accordingly, the court finds that Ms. Titterington's report is not inconsistent with the ALJ's opinion in this case.

In support of his argument, Gragg cites to several Eighth Circuit cases in which the court determined that borderline intellectual functioning should have been included as a severe impairment. However, these cases are factually different from the case at hand. In *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001), the ALJ erred

by accepting the results of one IQ test over another, without addressing the discrepancy between the two tests or discussing why one was considered to be valid and the other was not. The present case does not involve contradictory evidence, rather, as set forth above, the evidence is entirely consistent with the ALJ's findings. In *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001), the ALJ appropriately determined that the claimant had borderline intellectual functioning, but then failed to account for the impairment, or any other cognitive disorder, in the hypothetical presented to the vocational expert. As set out more fully in the subsequent section, the hypothetical presented to the vocational expert in this case adequately accounted for Gragg's cognitive impairments. Finally, in *Nicola v. Astrue*, 480 F.3d 885, 887 (8th Cir. 2007), the claimant was actually diagnosed with borderline intellectual functioning and the ALJ erred in failing to include this impairment, or any other cognitive impairment, in the list of claimant's severe impairments. In the case at hand, however, Gragg was never actually diagnosed with borderline intellectual functioning, and the ALJ properly included Gragg's diagnosed learning disorder in the list of his severe impairments.

Thus, the court concludes that the substantial evidence supports the ALJ's finding that Gragg's severe impairments include a learning disorder, and the ALJ did not err in excluding borderline intellectual functioning from the list of impairments.

B.  Vocational Expert Testimony

Gragg also argues that the hypothetical that the ALJ gave to the vocational expert was defective because it did not incorporate the limitations imposed by his cognitive impairments. As a result, Gragg asserts that the vocational expert's testimony lacks reliance to establish that there are jobs that Gragg can perform that exist in significant numbers within the regional and national economies.

At the administrative hearing, the ALJ posed the following hypothetical to the vocational expert:

> Okay, let me give you a hypothetical question.  Let me ask you to assume that we have a hypothetical claimant of the same age, education, and work experience as Alfred Gragg who can stand . . . six to eight hours a day.  He can lift 20 pounds occasionally, 10 pounds frequently. . . . [I]f he needed to reach up and get something on occasion he could do that but use of his arms above the level of the shoulder should not be a regular job task. . . .  No reading or writing as a job task and by that I mean . . . he can identify and read symbols.  He might be able to if it was repeated over and over read a single word such as a, you know, an instruction on/off, stop, pull or push or something like that but as far as reading and writing any sentences or anything more than something that simple he can't do it. . . .  He can add and subtract. . . .  He's limited to the performance of simple tasks.

The ALJ also restricted the hypothetical claimant to tasks that do not require frequent or prolonged contact with the general public.  In response to the hypothetical, the vocational expert opined that there was a variety of work that the hypothetical claimant could perform that would be subject to the listed restrictions.

"The hypothetical question need only include those impairments and limitations found credible by the ALJ." *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).  The hypothetical question posed by the ALJ in this case incorporated each of the physical, mental and cognitive impairments that the ALJ found to be credible, and excluded those impairments that were discredited or that were not supported by the evidence presented.  Additionally, although the hypothetical question did not actually use the term "learning disorder" or "borderline intellectual functioning," the ALJ specifically noted that Gragg could not read or write and was limited to simple tasks.

-14-

This is a sufficient representation of the limitations imposed by Gragg's cognitive impairments. *See Roe v. Chater*, 92 F.3d 672, 676 (8th Cir. 1996) ("While the hypothetical question must set forth all the claimant's impairments, it need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments." (internal citation omitted)); *see also Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) ("We find that describing [claimant] as capable of doing simple work adequately accounts for the finding of borderline intellectual functioning.").

Gragg relies on *Swope v. Barnhart*, 436 F.3d 1023 (8th Cir. 2006), to support his argument that the ALJ erred in failing to specifically refer to Gragg's alleged borderline intellectual functioning in the hypothetical posed to the vocational expert. While this argument is moot, considering the court's finding that the credible evidence did not suggest that Gragg was diagnosed with borderline intellectual functioning, the *Swope* case also does not stand for the principle Gragg asserts. In *Swope*, the error was not the ALJ's failure to use the term "borderline intellectual functioning" in the hypothetical posed to the vocational expert, rather the ALJ erred in not including *any* reference to the claimant's intellectual capacity. *See Swope*, 436 F.3d at 1024-25. In the present case, however, the ALJ included the limitations imposed by Gragg's cognitive impairments in the hypothetical, making it unnecessary to refer to Gragg's specific medical conditions.

Thus, the court concludes that the hypothetical that the ALJ gave to the vocational expert in this case properly incorporated the limitations imposed by Gragg's physical disabilities in combination with his cognitive impairments, and was not defective. Because the hypothetical was adequate, the vocational expert's testimony was reliable to establish that there are jobs that Gragg can perform that exist in significant numbers within the regional and national economies.

### III.

For these reasons, the judgment of the district court is affirmed.

_____