UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ERIC NSIAH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-cv-00042 (TNM-GMH) |
| | ) | |
| ANDREW SAUL[1] | ) | |
| in his official capacity as | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Plaintiff Eric Nsiah ("Plaintiff") brought this action seeking to reverse the final decision of the Commissioner of Social Security, Defendant Andrew Saul, ("Defendant" or "the Commissioner"), denying Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–434, 1381–1383f.[2] This case concerns provisions in the Social Security Act and its regulations stating that a claimant's application for benefits under the Social Security Act will be denied if a substance use disorder is a material contributing factor to the determination that the claimant is disabled. Specifically, Plaintiff argues that the Administrative Law Judge ("ALJ") (1) failed to adequately assess Plaintiff's residual functional capacity ("RFC") in the absence of Plaintiff's

---

[1] Andrew Saul is substituted as Defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, and the Clerk's Office is respectfully directed to change the case caption accordingly.

[2] The relevant docket entries considered by the undersigned for purposes of this Report and Recommendation are (1) Plaintiff's Motion for Judgment of Reversal (ECF No. 15); (2) Defendant's Motion for Judgment of Affirmance and in Opposition to Plaintiff's Motion for Judgement of Reversal (ECF No. 16); and (3) the Administrative Record (ECF No. 12). Plaintiff failed to file a reply memorandum. The page numbers cited herein are those assigned by the Court's Case Management/Electronic Case Filing (CM/ECF) system.

substance use disorder through a proper narrative, function-by-function analysis; (2) failed to incorporate restrictions in Plaintiff's RFC to account for his moderate limitation in maintaining concentration, persistence, or pace; and (3) failed to properly evaluate Plaintiff's subjective complaints and his credibility. Plaintiff seeks reversal of the Commissioner's decision or, in the alternative, a remand for a new administrative hearing.

Based on the parties' arguments and review of the entire record, Plaintiff's motion for judgment of reversal should be granted in part and denied in part, and Defendant's motion for judgment of affirmance should be denied.

## I. BACKGROUND

### A. Disability Determinations Under the Social Security Act

To be eligible for disability benefits under the Social Security Act, the Social Security Administration must find a claimant to be "disabled." 42 U.S.C. § 1382c(a)(3). To make that determination, an ALJ gathers evidence, holds a hearing, takes testimony, and performs the following five-step, sequential inquiry of the disability claim:

Step one: whether the claimant is "presently engaged in substantial gainful activity";

Step two: whether the claimant has a "medically severe impairment";

Step three: whether the claimant's impairment is equivalent to one of the disabling impairments listed in the appendix of the relevant regulation (known as "the Listings");

Step four: whether the impairment prevents the claimant from performing his or her past relevant work, in which case the ALJ will find the claimant not disabled; and

Step five: whether the claimant, in light of his or her age, education, work experience, and residual functional capacity (or "RFC")—i.e., the most he or she is able to do notwithstanding his or her physical and mental limitations—can still perform another job available in the national economy.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Butler v. Barnhart*, 353 F.3d 992, 997 (D.C. Cir. 2004).

The claimant bears the burden of proof at the first four steps of the evaluation. *See Callahan v. Astrue*, 786 F. Supp. 2d 87, 89 (D.D.C. 2011). At step five, the burden shifts to the Commissioner to identify specific jobs available in the national economy that the claimant can perform. *Id*. In making this determination, an ALJ may call a vocational expert ("VE") to testify at the hearing as to whether, based on the claimant's RFC, he or she can perform other work that exists in the national economy. *Id*. at 90. If no such work is identified, the claimant is deemed disabled.

Relevant here, if the Commissioner finds that the claimant is disabled but there is medical evidence that the claimant suffers from a substance use disorder, the Commissioner "must determine if the substance use disorder is a contributing factor material to the determination of disability." 42 U.S.C. § 1382c(a)(3)(J). The critical inquiry is whether the claimant would still be considered disabled absent substance use. *See* 20 C.F.R. §§ 404.1535(b), 416.935(b). If the claimant's remaining limitations would not be disabling absent substance abuse, then substance use is a contributing factor material to the determination of disability and the claimant will not be considered disabled overall. *See* 20 C.F.R. §§ 404.1535(b)(2)(i), 416.935(b)(2)(i). Pursuant to Social Security Ruling ("SSR") 13-2p, a policy interpretation ruling guiding analysis of cases involving drug addiction and alcoholism, also known as "DAA," the claimant bears the burden of proof regarding whether substance abuse is a contributing factor material to the determination of disability. *See* SSR 13-2p, 2013 WL 621536, at *4 (S.S.A. Feb. 20, 2013); *see also, e.g.*, *Parra v. Astrue*, 481 F.3d 742, 748 (9th Cir. 2007); *Doughty v. Apfel*, 245 F.3d 1274, 1276 (11th Cir. 2001); *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000); *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999).

**B.     Administrative Record**

**1.      Plaintiff's Disability Claims and Procedural History**

Plaintiff was 41 years old at the time of the ALJ's decision.  ECF No. 12-2 at 28.  After high school, Plaintiff joined the Army, but he was honorably discharged in 2001 due to smoking marijuana following military sexual trauma in 1997.  ECF No. 12-7 at 3; ECF No. 12-12 at 9.  He became dependent on phencyclidine ("PCP") around age 32 following his discharge from the military.  ECF No. 12-7 at 3.  He has three children with a former partner but has never been married.  *Id.*  Plaintiff was certified as a hairstylist in 1996 and worked on and off in that profession.  *Id.* at 4.  However, he has not engaged in substantial gainful activity since February 1, 2014.  ECF No. 12-2 at 19.

Plaintiff applied for DIB and SSI on August 27, 2014, claiming disability from depression, drug and alcohol abuse, and homelessness.  ECF No. 12-3 at 4.  He alleged a disability onset date of February 1, 2014.  *Id.*; ECF No. 12-2 at 19.  His application was denied initially on January 16, 2015, and again on reconsideration on December 28, 2015.  ECF No. 12-2 at 16.  Thereafter, Plaintiff requested a hearing before an ALJ, which was held on June 18, 2018.  *Id.* at 40.

Following the ALJ's denial of his DIB and SSI application on August 9, 2018 (ECF No. 12-2 at 32), Plaintiff requested a review of the ALJ's decision by the Appeals Council, which denied his request (*id.* at 2), making the ALJ's decision the final decision of the Commissioner of Social Security.  Having exhausted his administrative remedies, Plaintiff commenced this action under 42 U.S.C. § 405(g), seeking review of the Commissioner's denial of his DIB and SSI claims.  *See* ECF No. 15-1 at 1.

2.    Medical Records

On August 28, 2013, Plaintiff underwent a psychiatric evaluation with Theodore Osuala, M.D., on a referral from the U.S. Pretrial Office in Greenbelt, Maryland, prior to Plaintiff spending time in jail on a DUI charge. ECF No. 12-7 at 7–9. At that evaluation, Plaintiff reported smoking PCP once a day with his last usage being two days prior, and he reported having last smoked marijuana in 2010. ECF No. 12-9 at 7. He stated that he first used marijuana at age sixteen and first used PCP at age seventeen, and that his use of PCP increased around age 30 (around the year 2007). *Id.* Plaintiff said that using PCP made him hallucinate and lose track of reality, and that his "mind will wonder [sic] into habitual psychosis." *Id.* Dr. Osuala found Plaintiff calm and cooperative with normal speech, good hygiene, and grossly intact cognition. *Id.* at 8. Dr. Osuala recommended that Plaintiff begin taking Depakote (25 mg) and Trazodone (50 mg) and undergo psychotherapy; it is unclear from the record if those recommendations were followed for any length of time. *Id.* at 8–9. Medical records indicate that Plaintiff was released from jail on November 20, 2013. *Id.* at 161.

On April 3, 2014, Plaintiff was admitted to the Washington, D.C. VA Medical Center ("VAMC") suffering symptoms of PCP use. ECF No. 12-9 at 104. Medical records indicate that Plaintiff had been staying in a halfway house between his release from jail on November 20, 2013, and this hospital admission, and that he was participating in the outpatient Substance Abuse Rehabilitation Program ("SARP") through the VA. *See id.* Plaintiff reported that his last use of PCP was the day before his hospital admission and, on examination, he was described as somnolent, mildly disheveled, and cooperative, with poor eye contact; mild psychomotor retardation; slow, slurred speech; linear thought process; and a depressed mood. *Id.* at 104–05. His memory was poor; he could recall only one out of three words after a five-minute delay. *Id.* at 104. Plaintiff

remained at the hospital and received supportive psychotherapy there. *Id.* at 104–05. He was discharged on April 8, 2014, to an inpatient treatment facility—Avery Road Treatment Center in Rockville, Maryland—for a 28-day program. *Id.* at 104, 147. When discharged from the hospital, Plaintiff was described as awake and alert, appropriately groomed, and cooperative, with intact attention, concentration, and memory, normal psychomotor activity, euthymic mood, and normal speech. *Id.* at 170–71. Plaintiff was discharged from the Avery Road inpatient treatment program on May 12, 2014. *Id.* at 147.

On that same day, Plaintiff received a mental health assessment from Bruke Tadesse, Psy.D., at Family Health Center after a referral from the Federal Probation Office. *See* ECF No. 12-7 at 3–6. At that point, Plaintiff had been drug-free for over a month. *Id.* at 6. He participated actively in the examination and was appropriately groomed, alert, oriented, and cooperative. *Id.* at 5. He reported that PCP had been his "drug of choice" since he was seventeen years old. *Id.* at 6. Plaintiff reported "no history of trauma, learning disability, or conduct disorder that interfered with school and family"; however, the diagnostic inventory completed by Dr. Tadesse listed Plaintiff's post-traumatic stress symptoms as "moderate." *Id.* at 4–5. Furthermore, Dr. Tadesse opined that Plaintiff's addiction to PCP "seems to have compromised his mental stability," as evidenced by "sleep disorder, mood swing, irritability, hypo mania, and . . . poor judgment." *Id.* at 6. Plaintiff "could also be challenged by some emotional or traumatic episode that may be long standing and [that he is] struggling not to accept or deal with." *Id.*

Between May 12, 2014, and mid-July 2014, Plaintiff participated in outpatient substance abuse treatment through the VA. ECF No. 12-9 at 141, 147. During this time period, records reflect that Plaintiff was homeless and visited the VA homeless walk-in clinic regularly. *See id.* at 157–58. On June 16, 2014, Plaintiff presented to the VAMC Emergency Department; he stated

that he had relapsed after his inpatient treatment at Avery Road and had last smoked PCP three hours prior. *Id.* at 141–42. Plaintiff was briefly examined and then discharged to the Emergency Department lobby to wait for a social worker to discuss possibilities for detox programs with him. *Id.* at 143–56. On July 15, 2014, Plaintiff took a shuttle to Perry Point, an inpatient treatment center in Baltimore, Maryland, for inpatient drug abuse treatment. *Id.* at 137. At Perry Point, Plaintiff participated in an air rifle clinic, *id.* at 67–70, a spiritual health group, *id*. at 70–72, and a discharge planning group, *id.* at 73–74. On August 26, 2014, Plaintiff self-reported that, while out on a pass from Perry Point over the preceding weekend (August 22–24, 2014), he had used PCP. *Id.* at 57, 65. Plaintiff stated that the mother of his children would not let him stay with her when he was on pass, so he "slept on the ground somewhere and used PCP while wandering the streets." *Id.* at 57–58. Plaintiff was discharged from Perry Point due to that use of PCP. *Id.* at 43, 52.

After his discharge from Perry Point on August 26, 2014, Plaintiff continued seeking out-patient treatment through the VA. *See* ECF No. 12-9 at 114–37, 186. On September 3, 2014, Henry Kakembo, M.D. (mistakenly referred to as Dr. Lakewood in Defendant's motion for affir-mance, ECF No. 16 at 8), completed a medical report form in which he stated that Plaintiff was temporarily incapacitated from any form of employment or training activity from September 3, 2014, to September 3, 2015, due to treatment for drug use. ECF No. 12-7 at 10–13. On September 21, 2014, Plaintiff was hospitalized after having been noticed by Amtrak police to be acting strangely (but non-violently). ECF No. 12-9 at 128–29. Plaintiff admitted to having smoked PCP approximately one hour prior. *Id.* His medical record reported that he "looked well even at time of arrival" in the Emergency Department. *Id.* at 131. As soon as Plaintiff was clinically sober, in the early hours of September 22, 2014, he was discharged from the hospital. *Id.* On October 16, 2014, Plaintiff attempted to walk into a VA mental health clinic but appeared to be under the

7

influence and was unable to pull the door open on his own. *Id.* at 112. He was unable to form sentences and had difficulty understanding information given; he sat for a while in the lobby and then left. *Id.* at 115, 124. Approximately two-and-one half weeks later, on November 3, 2014, Plaintiff walked into the VAMC clinic for homeless veterans and reported that he was "clean and sober," living in an apartment, and working part-time in a hair salon. *Id.* at 122–23. He was described by staff as alert and well-groomed, with good eye contact, euthymic mood, and fluent speech. *Id.*

Plaintiff underwent a psychological consultative examination with Sheldon D. Weinstock, Ph.D. on November 20, 2014. ECF No. 12-9 at 186. Plaintiff denied current use of PCP—although he admitted that he had used the drug two days prior to the examination—and that he was afraid of relapsing. *Id.* at 186–87. Plaintiff further "denied difficulty taking care of himself" and stated that he "finish[ed] things for the most part," and that his ability to follow instructions was "fair to good." *Id.* at 187. Dr. Weinstock noted that Plaintiff was able to get to the appointment alone via train and that his "[w]ork habits were reasonable." *Id.* Plaintiff was "cooperative toward testing" and had a logical thought process; however, he seemed drowsy at times. *Id.* He was oriented to person, place, time, and activity, "with mostly fair to good concentration" except that he "appeared to lose focus and attention along with zoning out" during intelligence and memory testing. Dr. Weinstock stated that, looking at those test results, "one had significant questions and felt there was an attention problem and frustration," and opined that Plaintiff might have trouble "sustaining attention over a long period." *Id.* Dr. Weinstein noted that "persistence may be one of [Plaintiff's] issues" and concluded that his "use of PCP and marijuana may have led to depression, and perhaps even some neurocognitive decline." *Id.* at 190.

Eight days later, on November 28, 2014, Plaintiff went to the homeless walk-in clinic at the VAMC and stated that he was waiting for a referral to go to the Perry Point treatment facility. ECF No. 12-9 at 110. He reported that he was "using PCP on average daily" (although his last use was three days prior), was not keeping up with his medications, and had lost 20–30 pounds in the last three months. *Id.* Plaintiff was "calm and cooperative," "drowsy and oriented to time, place and person," and described his mood as "not that good." *Id.* at 111. He had normal speech and logical and linear thought process. *Id.* He was encouraged to take his medication on schedule and meet with his assigned social worker about getting into the Perry Point treatment facility. *Id.* at 112.

On December 11, 2014, State agency psychological consultant Alicia Maki, Ph.D, completed a consultative evaluation of Plaintiff's medical records in connection with the review of Plaintiff's application for benefits. ECF No. 12-3 at 9. Dr. Maki considered Plaintiff's reported claims for disability at the time, which were depression, drug and alcohol abuse, and homelessness. *Id.* at 4. Her review of the records— including Dr. Kakembo's medical report form of September 3, 2014, and Dr. Weinstein's report of his consultative examination on November 20, 2014— found that "[t]here is no question that [Plaintiff] has mental impairments and it is difficult to what degree long term [and] current use of PCP and Marijuana have impacted cognitive function"; she opined that Plaintiff was "moderately limited" in the ability to understand and remember detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual; to complete a normal week day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonable breaks, and to respond appropriately to changes in the work setting. *Id.* at 9–11. She concluded that Plaintiff was not disabled. *Id.* at 13.

Plaintiff began the VAMC's outpatient SARP on March 4, 2015; was last seen there on April 17, 2015; and was discharged on May 14, 2015, as he had been incarcerated on May 5, 2015, for showing up to court under the influence. ECF No. 12-10 at 55. Plaintiff's progress in SARP was "variable" and he was reported to have "continued to test positive for PCP," and had "irrational mood ranges and sporadic anger outbursts observed at intervals through [the] course of his SARP treatment." *Id.* The record is unclear as to when Plaintiff was released from jail. *See id.*

On December 7, 2015, Plaintiff returned to Dr. Osuala for a disability evaluation and psychiatric consultative evaluation report. ECF 12-12 at 2. Dr. Osuala stated that "it was clear that the patient was intoxicated" during the evaluation. *Id.* Plaintiff reported being homeless at the time of his examination and arrived at the examination by cab. *Id.* He reported feeling sad every day and that his sleep, appetite, energy, and concentration were "not good." *Id.* at 3. Plaintiff asserted that he had been in drug rehabilitation inpatient programs "more than ten times," that he used PCP "five to six times a day," and that he last used PCP two hours prior to coming to his evaluation. *Id.* He also admitted consuming alcohol a few days prior to the examination and using cocaine "one or two times a week." *Id.* Dr. Osuala described Plaintiff as alert and well-oriented, but also as disheveled, underweight, malodorous, uncooperative, hostile, and fidgety. *Id.* at 4. Plaintiff was angry and irritable with an inappropriate and constricted affect; however, his thought processes were logical and goal-directed, and he had no hallucinations or illusions. *Id.* at 4–5. Plaintiff reported being able to clean the room in the house where he lived on his own initiative and to care for his personal needs, go grocery shopping, and go to church every Sunday. *Id.* at 5–6. Ultimately, Dr. Osuala opined that Plaintiff was intoxicated with PCP at the examination and had difficulty with memory and concentration on top of being irritable; additionally, if Plaintiff

continued to use drugs, he "may have a lot of difficulty adapting to work-related stress or even relating with coworkers." *Id.* at 6.

On December 22, 2015, Plaintiff's case was evaluated at the reconsideration level by State agency psychological consultant Kevin Ragsdale, Ph.D. ECF No. 12-3 at 33. Based on a review of Plaintiff's medical records, Dr. Ragsdale opined that Plaintiff was moderately limited in the following abilities: understanding and remembering detailed instructions; maintaining attention and concentration for extended periods; completing a normal work day and workweek without interruption from psychologically based symptoms and performing at a consistent pace without unreasonable breaks; interacting appropriately with the general public; accepting instruction from and responding appropriately to criticism from supervisors; getting along with coworkers or peers; maintaining socially appropriate behavior and basic standards of neatness and grooming; and responding appropriately to changes in the work setting. *Id.* at 34–36. Dr. Ragsdale concluded that, even though Plaintiff "probably experiences some degree of reduction in cognitive power [and] efficacy," "with the benefit of conventional breaks, [Plaintiff] is capable of maintaining attention and persistence for 2-hour intervals while doing a task-specific occupation with nominal social demands." *Id.* at 36. Dr. Ragsdale opined that "any further or more severe limitations" exhibited by Plaintiff were "the result of adverse environmental factors brought into play as a function of his choices" as opposed to "being the exclusive result of a serious mental illness." *Id.* Dr. Ragsdale determined that Plaintiff was not disabled. *Id.* at 38.

Plaintiff's next medical records are from treatment at the VAMC. *See* ECF No. 12-12 at 8–90. His first progress note is dated May 9, 2016, and his most recent progress note is dated September 12, 2016. *Id.* at 29, 61. Plaintiff was assessed for and diagnosed with post-traumatic stress disorder ("PTSD") on June 6, 2016, at the VAMC. *Id.* at 8, 13. The PTSD stemmed from

11

sexual trauma that occurred in August 1997 when Plaintiff was in the service. *Id.* at 9. Plaintiff was enrolled in the Dual Diagnosis Track of the Trauma Services Program for treatment at the VA, which is designed to treat veterans with PTSD and substance use disorders. *Id.* He participated in four sessions of that program between January 9, 2017, and February 28, 2017. *Id.* at 91. On May 17, 2017, Sandor D. Illemsky, a staff clinician at the VAMC, verified that Plaintiff was seen and accepted back into the program at the VAMC and scheduled to begin out-patient treatment beginning on June 13, 2017. *Id.*

3. Plaintiff's and VE's Testimony at Oral Hearing before ALJ

Plaintiff's hearing before the ALJ occurred on June 18, 2018. ECF No. 12-2 at 38. Plaintiff testified to recently losing weight because of loss of appetite due to depression. *Id.* at 42–43. He also testified that he was currently living on his own and had been for the past four years—although he later testified that he was living with his mother at her house (*id.* at 59)—and that he was receiving $2,900 per month in income from VA disability assistance due to PSTD and military sexual trauma. *Id.* at 43–44. Plaintiff stated that he was unable to work because of flashbacks from his PTSD, which caused him to be unable to get out of bed, to focus, or to interact with people on a daily basis. *Id.* at 44. He explained that he had trouble remembering certain things and that a psychiatrist had told him he had memory loss due to his PTSD. *Id.* at 60–61. Subsequently, Plaintiff testified that his dependency on substances also affected him and caused him to be incarcerated for possession of PCP in July of 2015. *Id.* at 45–46. He stated that PCP was his "drug of choice" and that it was a problem for him "daily," but that he had not used it the day of his hearing or the day before. *Id.* at 47.

Plaintiff further testified that he had been in the military from 1997 to 2001 and thereafter worked in hair salons "off and on." ECF No. 12-2 at 48. He stated that he could not maintain

employment because of his traumatic experiences in the military. *Id.* Plaintiff explained that he sometimes did not get along well with people and was not always able to function when he was around people. *Id.* at 49–50. He testified that he had been homeless and had no friends, but that he stayed in contact with his mother and father through a cellphone, which he also used for email and to set appointments. *Id.* at 50–51, 55. He stated that he was currently seeing a doctor, Dr. Garzon, and that he was taking the medications Trazadone, Depakote, Latuda, and Lipitor as pre-scribed. *Id.* at 53, 57. Plaintiff also testified that he was regularly going to outpatient treatment programs in Washington, D.C., and that he travelled to his treatment classes on the subway. *Id.* at 53–54. He stated that he was able to prepare himself food in the microwave, dress and bathe himself, and do calisthenics workouts occasionally. *Id.* at 57–58.

During the same hearing, the VE, Lauren Wright, testified as to the vocational work that Plaintiff could do with various levels of non-exertional limitations. ECF No. 12-2 at 63–67. The VE stated that Plaintiff's past work, hairstyling, could not be performed under the ALJ's first hy-pothetical, which limited Plaintiff to "simple routine with occasional change in a routine work setting and just occasional interaction with public, coworkers, and supervisors." *Id.* at 63. How-ever, under that same hypothetical, the VE testified that Plaintiff could perform the jobs of hand packager, warehouse worker, or laundry worker. *Id.* at 63–64. The ALJ's second hypothetical imposed the same limitations as the first but added the restriction that the individual would miss two days of work per month; the VE testified that, with this addition, there were no jobs that Plaintiff could work on a full-time, competitive basis. *Id.* at 64. When Plaintiff inquired what levels of social interaction would be required in the jobs that the VE had identified in response to the first hypothetical, the VE responded that the level of social interaction would be employer-specific but could be performed with "very minimal interaction" with the public and "up to

occasional interaction with coworkers and supervisors." *Id.* at 65–66. Plaintiff additionally inquired what changes to normal routine the jobs under the first hypothetical would have; the VE testified that variations in routine would be employer-specific, but that in most cases there would be eight-hour shifts with fifteen-minute breaks at the beginning and end of the shift and a 30–60-minute lunch break. *Id.* at 66.

## C.    The ALJ's Decision

In this case, the ALJ found that, although Plaintiff suffered from multiple severe mental impairments, his substance use disorder was a contributing factor material to the determination that he had a disability; therefore, Plaintiff was not deemed disabled within the meaning of the Social Security Act. *See* ECF No. 12-2 at 25, 32. As particularly relevant here, in support of that conclusion the ALJ determined that "the treatment records from examinations where [Plaintiff] is under the influence are dramatically different from when [Plaintiff] is not intoxicated" and that "absent substance abuse, [his] symptoms would significantly decrease." *Id.* at 28.

The ALJ's decision, which was issued on August 9, 2018, engages in the conventional sequential inquiry. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 1, 2014, the alleged onset date. ECF No. 12-2 at 19. At step two, the ALJ found that Plaintiff's PTSD, depressive disorder, and PCP") use disorder were severe impairments in accordance with the regulations, which recognize an impairment as "severe" if it significantly limits an individual's "ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c); ECF No. 12-2 at 19.

At step three, the ALJ found that Plaintiff's severe mental impairments, including his substance use disorder, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, because neither paragraph B nor paragraph C criteria were

14

satisfied. ECF No. 12-2 at 19–20. As relevant here, the ALJ found that Plaintiff did not meet the paragraph B criteria, which require an extreme limitation in one area of mental functioning or a marked limitation in two, because, taking into consideration Plaintiff's PCP use disorder, he had a marked limitation in adapting or managing oneself, but only moderate limitations in understanding, remembering, or applying information; interacting with others; and concentrating, persisting, or maintaining pace. *Id*.

The ALJ supported his finding that Plaintiff had a marked limitation in adapting or managing himself by referring to instances in the record where Plaintiff was loud, irritable, uncooperative, had an unkempt appearance, and had poor insight and judgment when he was abusing PCP. ECF No. 12-2 at 20 (citing Dr. Osuala's psychiatric consultative examination report of December 7, 2015, at which he was intoxicated (ECF No. 12-12 at 2–7) and a medical record explaining Plaintiff's condition upon admission to the psychiatric ward on April 3, 2014, when he had used PCP one day prior (ECF No. 12-9 at 104)). As further support for his conclusion that Plaintiff had a marked limitation in adapting or managing himself, the ALJ emphasized that Plaintiff had a series of ensuing admissions into inpatient rehabilitation programs and demonstrated difficulty taking his medications on a regular basis. ECF No. 12-2 at 20 (citing a November 28, 2014 record from the VAMC mental health clinic reporting that Plaintiff continued to use PCP and was non-compliant with his medication regime (ECF No. 12-9 at 110) and a record that appears to be from his July 2014 intake at Perry Point (ECF No. 12-8 at 107)).

As to the ALJ's analysis of Plaintiff's moderate limitations in understanding, remembering, or applying information, the ALJ cited some of Plaintiff's medical consultation records and treatment notes evidencing his recurrent use of PCP and the effect of his PCP use on his mental functioning—specifically, Dr. Osuala's December 7, 2015 report of an examination completed while

15

Plaintiff was on PCP (ECF No. 12-12 at 5–6) and Plaintiff's mental status examination upon intake into the psychiatric ward in April 2014, when, after recent PCP use, he could remember only one word out of three (ECF No. 12-9 at 105). ECF No. 12-2 at 19. The ALJ also considered Plaintiff's own statements that he experienced memory loss and had difficulty understanding and following simple instructions when using PCP. *Id.*

In the analysis of Plaintiff's moderate limitations in interacting with others, the ALJ emphasized evidence throughout the record that, when Plaintiff was under the influence of PCP, he had "poor eye contact, mild psychomotor retardation, and slurred speech," and that treatment notes of Plaintiff "indicated irrational mood ranges and sporadic anger outbursts with use of PCP." ECF No. 12-2 at 19–20 (citing records from Plaintiff's admission into the psychiatric ward in April 2014 (ECF No. 12-9 at 104), an October 2014 report from the VA's homeless team relating that Plaintiff "appeared high" with slurred speech, slow reactions, and poor eye contact (*id.* at 115–16), and a note from his discharge from SARP in May 2015 discussing his outbursts while on PCP (ECF No. 12-10 at 55)). However, the ALJ also considered Plaintiff's statements during examinations that he panhandled daily and did not have difficulty interacting with others when doing so. ECF No. 12-2 at 20 (citing Plaintiff's report to Dr. Osuala in December 2015 that he could panhandle in public places without incident (ECF No. 12-12 at 6)). The ALJ concluded that this evidence indicated a moderate limitation. ECF No. 12-2 at 20.

When analyzing Plaintiff's moderate limitations in concentrating, persisting, or maintaining pace, the ALJ noted that Plaintiff testified as to difficulty focusing. ECF No. 12-2 at 20. The ALJ described the results of the consultative examinations by Dr. Weinstock in 2014 and by Dr. Osuala in 2015. At the first consultation, when Plaintiff had taken PCP two days before, he "had difficulty maintaining focus for the entirety of the test"; at the second, in which Plaintiff was under

the influence, he refused to attempt certain elements of the test. *Id*. (citing ECF No. 12-9 at 187; ECF No. 12-12 at 5). The ALJ concluded that this evidence amounted to a moderate limitation. ECF No. 12-2 at 20.

Because the ALJ found that the Plaintiff's mental impairments, including PCP use disorder, did not cause "at least one extreme limitation or two marked limitations," the paragraph B criteria were not satisfied. ECF No. 12-2 at 20. The ALJ also determined that the paragraph C criteria were not satisfied because the evidence in the record failed to establish that Plaintiff had only marginal adjustment, that is, a minimal capacity to adapt to changes in his environment or new demands in his daily life. *Id.* The ALJ specifically cited Plaintiff's ability to attend to his personal care, occasionally work, and live on his own to support this conclusion; he additionally determined that Plaintiff had difficulty with adapting to changes in his daily life only when he was not complying with his treatment by abusing substances or was under a major situational stressor. *Id.*

The ALJ next determined Plaintiff's RFC including all of Plaintiff's mental impairments and his PCP use disorder. The ALJ examined Plaintiff's medical history, including his psychiatric hospitalization in April 2014, from which he was discharged to a drug rehabilitation program; his inpatient treatment at Perry Point in July and August 2014, from which he was discharged due to PCP use; records from the remainder of 2014 showing continued drug use; a record noting that he was discharged from a drug rehabilitation program in 2015 because he violated his probation by appearing in court "under the influence"; and a record from April 13, 2015, indicating that Plaintiff had shown up for a mental health appointment intoxicated. ECF No. 12-2 at 21 (citing, in order, ECF No. 12-9 at 104–07; ECF No. 12-8 at 108–13, 244; ECF No. 12-9 at 110, 115–16, 124, 129, 131; ECF No. 12-10 at 55; and ECF No. 12-10 at 10). The ALJ went on to describe the opinion evidence and the weight he gave it, including (as discussed more fully below) the 2015 opinion

17

from psychological consultative examiner Dr. Osuala; the 2014 opinion from psychological consultative examiner Dr. Weinstock; the opinions of State agency psychological consultants Dr. Maki (from December 2014) and Dr. Ragsdale (from December 2015); the 2014 report from Dr. Kakembo; a 2017 disability determination from the VA; and a 2014 third-party function report from Plaintiff's mother. He concluded that Plaintiff's RFC allowed him to "perform a full range of work at all exertional levels but with the following non[-]exertional limitations": He was limited to (1) simple, routine, unskilled tasks; (2) occasional changes in a routine work setting; and (3) occasional interaction with the public, co-workers, and supervisors." ECF No. 12-2 at 21. In addition, the ALJ concluded that when Plaintiff was abusing substances, he was likely to miss two or more days of work a month because his insight and judgment would be impaired, his mood would be irritable, his appearance would be disheveled, he would be uncooperative, and he would have difficulty understanding information. *Id.* at 21–22.

At step four, the ALJ concluded that Plaintiff would not be able to perform his past relevant work of hairstyling because the requirements of that job exceeded the parameters of his RFC. ECF No. 12-2 at 24. At step five, the ALJ concluded that, in light of a VE's testimony and Plaintiff's age, education, work experience, and RFC (including his substance use disorder), there were no jobs that existed in significant numbers in the national economy that Plaintiff could perform. *Id.* at 25. That conclusion appears to have rested on the limitation include in the RFC that Plaintiff would miss two days per month of work. *See id.* at 63–64 (testimony of the VE that a person of Plaintiff's age, education, and work experience who was limited to simple, routine work with occasional changes in the work setting and occasional interaction with the public, coworkers, and supervisors could perform jobs in the national economy, but that if that person was absent two days per month, there would be no such jobs the person could perform). Therefore, the ALJ

18

concluded that, when Plaintiff's substance use disorder was considered, a finding of "disabled" was appropriate. *Id.*

Plaintiff does not challenge that conclusion, which would, in the absence of evidence that Plaintiff's substance use disorder contributed to the finding of disability, entitle him to benefits. *See, e.g.*, SSR 16-3p, 2016 WL 1119029, at *11 (S.S.A. Mar. 16, 2016) ("If an individual's impairment meets or medically equals the severity requirements of a listing, we find him or her disabled."). Plaintiff does take issue, however, with the ALJ's subsequent analysis, which found that Plaintiff would not continue to be disabled if he stopped using PCP. SSR 13-2p, 2013 WL 621536, at *2 ("When we adjudicate a claim for . . . [SSI] payments based on disability . . . [that] includes evidence from acceptable medical sources . . . establishing that DAA is a medically determinable impairment[ ] . . . and we determine that a claimant is disabled considering all of the claimant's medically determinable impairments . . . , we must then determine whether the claimant would continue to be disabled if he or she stopped using drugs or alcohol . . . .").

In making that determination, the ALJ first found that if Plaintiff stopped abusing substances, his PTSD and depression would still qualify as severe impairments. ECF No. 12-2 at 25. Again, the ALJ found that, without substance use, Plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 25–26. Specifically, with respect to understanding, remembering, or applying information, the ALJ found that, absent substance use, Plaintiff would have a mild, rather than a moderate, limitation. *Id*. at 26. The ALJ cited the November 2014 consultative examination when Plaintiff was not currently intoxicated (although he had used PCP in the recent past) in which Dr. Weinstock indicated that Plaintiff could follow simple instructions and notes from Plaintiff's discharge from his

psychiatric hospitalization in April 2014, at which time he was sober and his memory was "intact." *Id.* at 26 (citing ECF No. 12-9 at 107, 186–90).

As to interacting with others, the ALJ explained that Plaintiff was generally found to be "cooperative and pleasant" at mental status evaluations and "had good eye contact" when he was not intoxicated. ECF N0. 12-2 at 26 (citing records from April 2014 (ECF No. 12-9 at 107), June 2014 (ECF No. 12-9 at 162), September 2014 (ECF No. 12-8 at 205), and November 2014 (ECF No. 12-9 at 122)). He nevertheless determined that, due to his PTSD, Plaintiff would continue to have a moderate limitation if he stopped abusing substances. ECF No. 12-2 at 26.

With respect to Plaintiff's ability to concentrate, persist, or maintain pace, the ALJ concluded that Plaintiff would still have a moderate limitation if the substance abuse stopped. ECF No. 12-2 at 26. The ALJ cited Plaintiff's full-scale IQ of 81 measured at his 2014 consultative psychological examination, when Plaintiff's "concentration was fair to good, with a drop off in concentration and focus towards the end of the testing process" (*id.* (citing ECF No. 12-9 at 185–90))—although Dr. Weinstock noted that Plaintiff had admitted at that examination to using PCP "as recently as several days before [the] examination" (ECF No. 12-9 at 189). The ALJ additionally cited other records noting that Plaintiff's "concentration was intact" when he was not using PCP. ECF No. 12-2 at 26. Specifically, the ALJ cited the discharge notes from Plaintiff's six-day in-patient psychiatric admission in March 2014 and the psychiatric report from a State agency disability evaluation in December 2015. *Id.* (citing ECF No. 12-9 at 107; ECF No. 12-12 at 2–7).

Finally, the ALJ determined that Plaintiff would have a mild, rather than severe, limitation as to adapting or managing himself if the substance abuse stopped. ECF No. 12-2 at 26. The ALJ cited examinations where Plaintiff was "adequately groomed and with a euthymic mood" when he was not using PCP. *Id.* (citing Dr. Tadesse's May 2014 mental health assessment (ECF No. 12-7

20

at 5); a September 2014 progress note (ECF No. 12-8 at 205); a June 2014 follow-up treatment note (ECF No. 12-9 at 162); and a July 27, 2016 substance abuse treatment note (ECF No. 12-12 at 48)). The ALJ stated that "there were no noted deficiencies in [Plaintiff's] insight and judgment without substance abuse." ECF No. 12-2 at 26. Finally, the ALJ considered that, as of November 2014, Plaintiff "was also able to work on at least a part-time basis when he was not using PCP" and "was able to use public transportation to attend his medical appointments." *Id.* (citing a record indicating that, in November 2014, Plaintiff reported that he was working part-time in a hair salon, and Dr. Weinstock's consultative examination report from that same time period reporting that Plaintiff "has done cosmetology work on and off" and that he "came to the evaluation alone by train" (ECF No. 12-9 at 123, 185–90)).

As with the ALJ's analysis of Plaintiff's disability considering substance abuse, because the ALJ found that the Plaintiff's mental impairments, excluding substance use, did not cause "at least one extreme limitation or two marked limitations," the paragraph B criteria were not satisfied. ECF No. 12-2 at 26. The ALJ again also determined that the paragraph C criteria were not satisfied because the evidence in the record failed to establish that Plaintiff had only marginal adjustment, that is, a minimal capacity to adapt to changes in his environment or new demands in his daily life. *Id.* The ALJ specifically cited Plaintiff's ability to attend to his personal care, occasionally work, and live on his own; he additionally determined that Plaintiff had difficulty with adapting to changes in his daily life only when he was not complying with his treatment by abusing substances or was under a major situational stressor. *Id.*

The ALJ next determined Plaintiff's RFC excluding substance abuse. Broadly, the ALJ concluded that, if Plaintiff stopped his substance abuse, his medically determinable impairments of PTSD and depression could reasonably be expected to produce his alleged symptoms but that

21

Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the objective medical and other evidence." ECF No. 12-2 at 28.

The ALJ determined Plaintiff's RFC by contrasting Plaintiff's symptoms with and without substance abuse as evidenced by Plaintiff's medical records; the ALJ determined that in the absence of substance abuse, Plaintiff's symptoms would decrease to the point that "he could complete an eight-hour workday or forty-hour workweek without interruptions from psychologically based symptoms." ECF No. 12-2 at 28. As support for that finding, he cited the 2015 consultative examination with Dr. Osuala, at which Plaintiff was intoxicated and "uncooperative, hostile, loud, belligerent, and presented with a disheveled and malodorous appearance, inappropriate mood, and poor eye contact." *Id.* (citing ECF No. 12-12 at 4). The ALJ additionally discussed notes from a walk-in clinic for the homeless that Plaintiff attended in October 2014, when Plaintiff was intoxicated with PCP and "was unable to formulate sentences, had difficulty understanding information, slurred speech, blunted affect, and he was easily distracted." ECF No. 12-2 at 28 (citing ECF No. 12-9 at 115–16, 124). The ALJ contrasted this evidence with notes of Plaintiff's behavior and appearance in April 2014 when he was not under the influence of PCP after inpatient treatment at Perry Point: Plaintiff was "appropriately groomed, cooperative, and had normal psychomotor activity, an euthymic mood, and normal speech." ECF No. 12-2 at 28 (citing ECF No. 12-9 at 107). The ALJ cited further a note from the homeless walk-in clinic in November 2014 again when Plaintiff was not under the influence of any substance, that reported that he was "well groomed, he had normal speech, good eye contact, an euthymic mood, and logical thought." ECF No. 12-2 at 28 (citing ECF No. 12-9 at 122–23).

Turning to opinion evidence, the ALJ afforded the 2015 opinion of the psychological consultative examiner, Dr. Osuala, great weight. ECF No. 12-2 at 28–29 (citing ECF No. 12-12 at 2–

22

7). The ALJ emphasized Dr. Osuala's opinion's consistency "with the examination findings and other mental status examinations when [Plaintiff] is intoxicated." *Id.* at 28. Specifically, he found that Dr. Osuala's assessment that Plaintiff "would have difficulty adapting to work-related stress or even relating with coworkers if he continued to use drugs" was consistent with multiple examinations and other records that described Plaintiff as being uncooperative, disheveled, and suffering from mild psychomotor retardation and slurred speech when under the influence of PCP. *Id.* at 28–29. The ALJ gave the 2014 report of consultative examiner Dr. Weinstock only "[s]ome weight" because this report did not "contain any clear statements of [Plaintiff's] specific work-related limitations." *Id.* at 29. The ALJ found the report indicated that Plaintiff was "cooperative, well-kempt, with normal behavior, normal speech, an euthymic mood, and logical thought." *Id.*

The ALJ assigned some weight to the conclusions of state agency psychological consultants, Dr. Maki (from December 2014) and Dr. Ragsdale (from December 2015), who each concluded that Plaintiff was not disabled. ECF 12-2 at 29. The ALJ explained that these conclusions merited only some weight because Plaintiff was diagnosed with the additional mental health impairment of PTSD after these consultants' reports were concluded. *Id.* Additionally, the ALJ noted that these consultants evaluated Plaintiff's case under outdated mental health regulations. *Id.*

The ALJ assigned little weight to Plaintiff's Global Assessment of Functioning ("GAF") scores throughout the record; the third-party function report of Georgina Nsiah, Plaintiff's mother; the report of Dr. Henry Kakembo stating that Plaintiff was unable to work and in a drug treatment program from September 2014 to September 2015; and the Veteran Administration's determination that Plaintiff's PTSD and PCP use disorder were a service-connected disability. ECF No. 12-2 at 29–30. Plaintiff's GAF scores were given little weight because the Commissioner "has

23

declined to endorse GAF scores for use in the Social Security disability programs, and has indicated that such scores have no direct correlation to the severity requirements of the mental disorders listings." *Id.* at 29. Georgina Nsiah's third-party function report was given little weight because she was not a medical source and her relationship with Plaintiff would "naturally tend to be colored by affection for [Plaintiff]." *Id*. at 30. The ALJ additionally noted that Georgina Nsiah's statements as to the severity of Plaintiff's symptoms were inconsistent with the medical evidence of record. *Id.* Dr. Kakembo's report was given little weight because the work restrictions in the report were temporary in nature and failed to identify any specific functional limitations for Plaintiff. *Id.* The Veteran Affairs' determination was given little weight because the evaluation was not permanent and subject to review; additionally, the determination was not based on Social Security Administration policy or definitions of disability. *Id.*

From that evidence, the ALJ concluded that Plaintiff's RFC without substance abuse was identical to his RFC taking substance abuse into account, with one material difference: Plaintiff would no longer miss two days per month of work. That is, Plaintiff's RFC without substance abuse allowed him to "perform a full range of work at all exertional levels but with the following nonexertional limitations": He is limited to (1) simple, routine, unskilled tasks; (2) occasional changes in a routine work setting; and (3) occasional interaction with the public, co-workers, and supervisors. ECF No. 12-2 at 27; *see also id.* at 21–22 (describing Plaintiff's RFC with substance abuse).

At step four, consistent with the VE's opinion, the ALJ determined that, although Plaintiff would be able to perform work limited to his RFC, his limitations would still preclude him from performing his past work as a hairstylist even if he stopped his substance abuse. ECF No. 12-2 at 30–31. However, again with the help the of VE's opinion, the ALJ concluded at step five that,

without the limitation that Plaintiff would miss two days per month of work due to substance abuse, there are a significant number of jobs in the national economy that Plaintiff could perform, including hand packer, warehouse worker, and laundry worker. *Id.* at 31. Because the ALJ found that Plaintiff's substance use disorder was a contributing factor to the determination of disability and because Plaintiff's RFC in the absence of drug use would allow him to perform the above listed work, the ALJ determined that Plaintiff "has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision." *Id.* at 32.

## II.    LEGAL STANDARD

A federal district court has jurisdiction over a civil case challenging a final decision of the Commissioner. 42 U.S.C. § 405(g). A reviewing court must affirm the Commissioner's decision if it is based on substantial evidence in the record and the correct application of the relevant legal standards. *Id.*; *Butler*, 353 F.3d at 999.

The plaintiff bears the burden of proving that the Commissioner's decision is not supported by substantial evidence. *Id.*; *see also Brown v. Barnhart*, 408 F. Supp. 2d 28, 31 (D.D.C. 2006). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted). It requires "more than a mere scintilla of evidence, but can be satisfied by something less than a preponderance of the evidence." *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 365–66 (D.C. Cir. 2003). "The substantial evidence standard requires considerable deference to the decision rendered by the ALJ." *Crosson v. Shalala*, 907 F. Supp. 1, 2 (D.D.C. 1995). The reviewing court may neither reweigh the evidence presented to it nor replace the Commissioner's judgment "concerning the credibility of the evidence with its own." *Id.* at 3; *see also*

*Butler*, 353 F.3d at 999 (finding that the district court's role is not to reweigh the evidence but only to determine whether the ALJ's findings are "based on substantial evidence and a correct interpretation of the law"). However, "this standard of review requires the Court to carefully scrutinize the entire record to ensure that the Commissioner, through the ALJ, has both analyzed all of the evidence available and has sufficiently explained his/her reasoning and the weights given to the facts." *Pinkney v. Astrue*, 675 F. Supp. 2d 9, 14 (D.D.C. 2009); *see also Lane-Rauth v. Barnhart*, 437 F. Supp. 2d 63, 65 (D.D.C. 2006) ("[T]his standard of review 'calls for careful scrutiny of the entire record,' to determine whether the Commissioner, acting through the ALJ, 'has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits[.]'" (second alteration in original) (quoting *Butler*, 353 F.3d at 999)). Moreover, the Court's job is to "consider the grounds actually proffered by the ALJ" rather than to make those determinations for itself, *Ward v. Berryhill*, 246 F. Supp. 3d 202, 209 (D.D.C. 2017), or credit "post-hoc rationalization[s]" advanced by the parties, *Cooper v. Berryhill*, No. 16-cv-1671 DAR, 2017 WL 4326388, at *5 (D.D.C. Sept. 28, 2017); *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (holding that a reviewing court "must judge the propriety of [an agency's judgment] solely by the grounds invoked by the agency"); *Jones v. Astrue*, 647 F.3d 350, 356 (D.C. Cir. 2011) (citing *Chenery*, 332 U.S. at 196).

### III.    DISCUSSION

Plaintiff presents three arguments that the ALJ's determination of Plaintiff's RFC in the absence of substance abuse was flawed. The first two arguments are closely related and, indeed, included in the same section of his brief. He first argues that the ALJ's discussion of Plaintiff's RFC in the absence of substance abuse is generally deficient because it does not identify and explain the specific medical evidence upon which each limitation in the RFC was based. ECF No.

15-1 at 3–8. The second argument is a more pointed application of the first: Plaintiff contends that the ALJ failed to explain how his RFC determination accounted for Plaintiff's moderate limitation in maintaining concentration, persistence, or pace. *Id.* at 8–9. Third, Plaintiff contends that the ALJ erroneously evaluated Plaintiff's subjective complaints as to the intensity, persistence, and limiting effects of his symptoms. While the first and third arguments are unavailing, the undersigned finds the second argument requires that this case be remanded to the SSA for further administrative proceedings. Nevertheless, for the sake of completeness, each argument is addressed in turn below.

### A.    Plaintiff's RFC in the Absence of Substance Abuse

Plaintiff first contends that the ALJ erred in assessing his RFC by not setting forth a narrative discussion as to how the evidence supported the RFC that Plaintiff could perform "simple, routine, unskilled tasks, with occasional changes in a routine work setting, and only occasional interactions with the public, coworkers, and supervisors, over an eight-hour workday" if Plaintiff stopped his substance abuse. ECF No. 15-1 at 6. As noted, in this first argument, Plaintiff does not point to a specific deficiency in the ALJ's reasoning, but generally contends that the ALJ did not sufficiently explain how the evidence of record supported each of the limitations in Plaintiff's RFC (without substance abuse). The discussion in this subsection takes Plaintiff's argument as it is presented—that is, as a general objection to the ALJ's explanation as to the RFC determination. The next subsection addresses Plaintiff's more successful and more specific issue with regard to Plaintiff's limitation in maintaining concentration, persistence, or pace.

To support his blanket objection to the ALJ's explanation of the RFC determination, Plaintiff (1) extensively quotes Social Security Ruling ("SSR") 96-8p (a policy interpretation ruling subtitled "Assessing Residual Functional Capacity in Initial Claims," 1996 WL 374184 (S.S.A.

July 2, 1996)),[3] as well as SSI regulations found at 20 C.F.R. § 416.945(b) & (c) (entitled "Your residual functional capacity"), and certain case law explaining the requirement of a function-by-function analysis supported by a narrative discussion; (2) quotes two paragraphs from the ALJ's decision supporting his conclusion that Plaintiff's mental health impairments would decrease in the absence of substance abuse such that he would be able to complete a normal work day and work week without interruption from psychologically-based symptoms; and (3) asserts that the ALJ's analysis fails to explain how

> Plaintiff would be capable of performing substantial gainful activity, eight hours per day, five days per week, would have no issue with persistence, pace, or attendance, and would be capable of the performance of simple, routine, unskilled tasks, with occasional changes in a routine work setting, and only occasional interaction with the public, coworkers, and supervisors.

ECF No. 15-1 at 3–8. The undersigned has previously found such an argumentative technique unhelpful. *See, e.g.*, Report and Recommendation at 25, *Simmons v. Saul*, No. 18-cv-1293 (JDB/GMH) (D.D.C. Sept. 30, 2019), ECF No. 24 (calling a similar argument "slapdash"), *report and recommendation adopted*, Order, No. 18-cv-1293 (JDB/GMH) (D.D.C. Oct. 22, 2019), ECF No. 25. Here, this generalized argument is ultimately unpersuasive.

> SSR 96-8p requires a narrative from the ALJ as to Plaintiff's RFC that
>
> [c]ontain[s] a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate; include[s] a resolution of any inconsistencies in the evaluation as a whole; and [sets] forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work.

1996 WL 374184, at *7. In the process of identifying a claimant's limitations, the ALJ must set forth "a narrative discussion connecting the evidence to the limitations found" to build a logical

---

[3] SSR 96-8p was rescinded for claims filed on or after March 27, 2017. Revision to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 5855 (Jan. 18, 2017). Because Plaintiff's claim was filed prior to that date, the ruling continues to apply in this case.

bridge between the evidence in the record and the determined RFC. *Williams v. Colvin*, 134 F. Supp. 3d 358, 365 (D.D.C. 2015). This narrative discussion "is sufficient for the ALJ to fulfill [his] obligation to complete a function-by-function analysis that allows the [court] to conduct a meaningful review." *Davis v. Berryhill*, 272 F. Supp. 3d 154, 172 (D.D.C. 2017); *Banks v. Astrue*, 537 F. Supp. 2d 75, 84–85 (D.D.C. 2008) (when the ALJ "provided a thorough narrative discussion of [the claimant's] limitations," a function-by-function analysis was not required). The ALJ must clearly explain "which particular pieces of evidence led him to his conclusion" to build a logical bridge between the evidence and the ALJ's finding of Plaintiff's RFC, rather than simply list the evidence considered. *Lane-Rauth*, 437 F. Supp. 2d at 67; *Pinkney*, 675 F. Supp. 2d at 17–18 (an ALJ's consideration of a case is sufficient if, instead of "merely list[ing] the evidence" the ALJ "explain[s] which evidence he found credible and why and also discuss[es] that there was limited information in the medical record, supported by medical findings, to support a ruling of a disability"). Moreover, if there is conflicting evidence in the record, or if an ALJ discounts evidence in the record for any other reason, the ALJ must weigh and discuss that evidence to provide a rationale as to why the evidence was rejected or given little weight. *Ross v. Astrue*, 636 F. Supp. 2d 127, 133 (D.D.C. 2009); *Ruppert v. Saul*, No. 18-cv-0148 (CKK), 2020 WL 136519, at *20 (D.D.C. Jan. 13, 2020); *Nicholson v. Astrue*, No. 10–2010 RWR/DAR, 2012 WL 4511271, at *8–9 (D.D.C. Mar. 14, 2012); *see also Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015). Ultimately, an ALJ's decision is supported by substantial evidence when the ALJ discusses the evidence of record, weighs the sources and substance of that evidence, and makes an RFC determination that conforms to the discussion and weighing of the evidence. *Cunningham v. Colvin*, 46 F. Supp. 3d 26, 36 (D.D.C. 2014); *see also Hartline v. Astrue*, 605 F. Supp. 2d 194 (D.D.C. 2009).

The ALJ assigned Plaintiff an RFC allowing him to work at all exertional levels with non-exertional limitations to "simple, routine, unskilled tasks; occasional changes in a routine work setting; and occasional interaction with the public, co-workers, and supervisors." ECF No. 12-2 at 27. The ALJ's logical bridge between the evidence of record, Plaintiff's nonexertional limitations, and Plaintiff's RFC absent substance abuse consisted primarily of a comparison between evidence of Plaintiff's abilities and behavior when intoxicated and when not intoxicated with PCP. ECF No. 12-2 at 28. The ALJ determined that Plaintiff's symptoms generally would "significantly decrease" if the substance abuse stopped, relying on evidence in the record that Plaintiff's general ability to function improved when he was not using PCP. *Id.* The ALJ cited records showing that, when Plaintiff was intoxicated, he was "uncooperative, loud, belligerent, and presented with a disheveled and malodorous appearance, inappropriate mood, and poor eye contact" or that he was "unable to formulate sentences, had difficulty understanding information, slurred speech, blunted affect, and was easily distracted," but when he was sober he was "appropriately groomed" and "cooperative" with a "euthymic mood," logical thought, and "normal" psychomotor activity, speech, and eye contact. *Id.* That is, the records supported the ALJ's findings that, in the absence of substance abuse, Plaintiff would have only mild deficiencies in his ability to understand and apply information, to interact with others, and to manage himself. Those mild deficiencies are reflected in Plaintiff's limitations to simple, routine, unskilled tasks; occasional changes in a routine work setting; and occasional interaction with the public, co-workers, and supervisors.

Additionally, the ALJ discussed how the evidence in the record conflicted with Plaintiff's subjective complaints and explained why he weighed Plaintiff's subjective complaints as he did. Finally, the ALJ noted other potentially conflicting evidence within the record, weighed the conflicting evidence, and explained the weight given to that evidence. For example, the ALJ

30

sufficiently explained why he gave little weight to (1) Plaintiff's GAF scores, reasoning that the Commissioner has not endorsed such scores for use in Social Security benefits determinations; (2) the third-party function report of Plaintiff's mother, which was inconsistent with the medical evidence of record; (3) the report of Dr. Kakembo, who identified temporary work restrictions connected to Plaintiff's substance abuse treatment with no specific functional limitations; and (4) the VA determination regarding Plaintiff's disability—which was not based on definitions of disability used by the SSA—stating that Plaintiff was unable to work and in a drug treatment program from September 2014 to September 2015. *Id.* at 29–30.

As a general matter, this reasoning provides a sufficient logical bridge between the medical evidence and the RFC limitations the ALJ imposed. *See* ECF No. 12-2 at 27–30. The ALJ's decision does not merely list the evidence that informed the ALJ's conclusion (insufficient under *Lane-Rauth*, 437 F. Supp. 2d at 67); instead, the ALJ "explained which evidence he found credible and why," *Pinkney*, 675 F. Supp. 2d at 17–18, in his weighing of opinion evidence, Plaintiff's subjective complaints, and evidence in the medical record. *See* ECF No. 12-2 at 27–30. Additionally, the ALJ "discussed that there was limited information in the medical record, supported by medical findings, to support a ruling of a disability." *Pinkney*, 675 F. Supp. 2d at 17–18. However, as discussed further below, the ALJ's RFC failed to account for Plaintiff's moderate limitation in maintaining concentration, persistence, or pace.

**B.      Plaintiff's Moderate Limitation in Maintaining Concentration, Persistence, or Pace**

Plaintiff's second point, although not particularly well-developed in his brief (he devotes a single paragraph to it) is nevertheless more successful than the generalized point just addressed. This argument focuses on whether the ALJ's RFC in the absence of substance abuse properly accounts for Plaintiff's moderate limitation in maintaining concentration, persistence, or pace.

31

ECF No. 15-1 at 8. The undersigned finds that the ALJ's decision does not establish that the RFC's nonexertional limitations of "simple, routine, unskilled tasks; occasional changes in a routine work setting; and occasional interaction with the public, co-workers, and supervisors" adequately encapsulate that limitation. ECF No. 12-2 at 27.

An ALJ must tailor a claimant's RFC to his or her specific limitations. *See Williams*, 134 F. Supp. 3d at 365. Generally, limiting a claimant to "simple, routine, and repetitive tasks" is insufficient to incorporate a moderate limitation in maintaining concentration, persistence, or pace, because "the ability to perform simple tasks differs from the ability to stay on task." *Petty v. Colvin*, 204 F. Supp. 3d 196, 206–207 (D.D.C. 2016) (quoting *Mascio*, 780 F.3d at 638); *see also Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004). Put another way, a moderate limitation in maintaining concentration, persistence, or pace "necessarily establish[es] some deficit in [the claimant's] 'ability to sustain focused attention and concentration' long enough 'to permit the timely and appropriate completion of tasks commonly found in work settings.'" *Terri D. v. Berryhill*, No. 5:17-cv-00022, 2018 WL 4688740, at *8 (W.D. Va. Sept. 28, 2018) (quoting the definition of "concentration, persistence, or pace" from the Listings, and citing *Petty*, 204 F. Supp. 3d at 206). An ALJ's RFC assessment must therefore "either adequately account for this deficit or adequately explain why, notwithstanding [that] finding, [the claimant's] overall limitations 'do not affect [his] capacity to sustain simple, routine, or unskilled work.'" *Terri D.*, 2018 WL 4688740, at *8 (quoting *Perdue v. Colvin*, No. 7:14-cv-173, 2015 WL 5771813, at *6 (W.D. Va. Sept. 30, 2015)).

Here, the ALJ's determination did neither; it did not explicitly or implicitly address how Plaintiff's moderate limitation in the ability to maintain concentration, persistence, or pace affected his RFC. Rather, as discussed above, the ALJ relied primarily on evidence in the record that

32

Plaintiff's general ability to function improved when he was not using PCP, focusing on Plaintiff's ability to understand and apply information, to interact with others, and to manage himself—but not his ability to maintain concentration, persistence, or pace. ECF No. 12-2 at 28–29. As noted, the ALJ discussed records showing that, when Plaintiff was intoxicated, he was "uncooperative, loud, belligerent, . . . disheveled[,] and malodorous" with an "inappropriate mood, and poor eye contact" or that he had trouble formulating sentences, speaking clearly, understanding information, and concentrating; but when he was sober he was "appropriately groomed" and "cooperative" with a "euthymic mood," logical thought, and "normal" psychomotor activity, speech, and eye contact. *Id.* at 28. The undersigned is unable to glean much from that explanation about the effect of Plaintiff's sobriety on his ability to sustain focused attention and concentration. And the ALJ nowhere addressed the question of how Plaintiff's moderate limitation in maintaining concentration, persistence, or pace is consistent with an RFC that finds that Plaintiff could complete a normal work day and work week of sustained simple, routine, unskilled tasks.[4]

However, failing to account for moderate limitations in maintaining concentration, persistence, or pace, or to explain why those limitations do not affect the claimant's ability to sustain simple, routine, unskilled work "is generally considered harmless" if the medical evidence itself establishes that the claimant is capable of completing such tasks despite that limitation. *Davis*, 272 F. Supp. 3d at 172; *cf. Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) (finding that a doctor's assessment that the claimant could sustain sufficient concentration to perform simple, routine, repetitive tasks despite a moderate limitation was sufficient to substantiate ALJ's RFC). Thus, to determine if such an error is harmless, there must be substantial evidence in the record to

---

[4] This should not be read to imply that an RFC limiting a claimant to simple, routine, unskilled work can *never* be consistent with a moderate limitation in maintaining concentration, persistence, or pace, but merely that an ALJ assessing an individual with that limitation must explain how such an RFC is consistent with the claimant's trouble with concentration, persistence, or pace.

demonstrate that, despite a claimant's moderate limitation in maintaining concentration, persistence, or pace, he can nevertheless sustain simple, routine, unskilled work in the absence of substance abuse. *See Davis*, 272 F. Supp. 3d at 172; *McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014); *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011).

Here, there is insufficient evidence in the record to allow the Court to make that determination in the first instance. There is not, for example, opinion evidence directly addressing Plaintiff's ability to sustain concentration, persistence, or pace based solely on his depression and PTSD, which was not diagnosed until May 2016. As the ALJ noted in assessing Plaintiff with a moderate limitation in maintaining concentration, persistence, or pace even without drug abuse, at his 2014 testing with Dr. Weinstock, Plaintiff reported that he had used PCP two days before the evaluation. ECF No. 12-9 at 187. During that testing regimen, Plaintiff's concentration was initially fair to good "with a drop off in concentration and focus towards the end of the testing process" that the doctor primarily attributed to the length of the test rather than to Plaintiff's substance abuse or other claimed disability. *Id.* Dr. Weinstock stated that Plaintiff needed to be "refocused" on the test at times; additionally, he stated that Plaintiff "may have had trouble sustaining attention over a long period of both tasks" that Dr. Weinstock used in his testing of Plaintiff. *Id.* The ALJ assigned only some weight to Dr. Weinstock's opinion because it did "not contain any clear statements of [Plaintiff's] specific work-related limitations." ECF No. 12-2 at 23. That is, the ALJ apparently found Dr. Weinstock's report of limited use in determining Plaintiff's RFC in the absence of drug use. The ALJ additionally pointed out that "other doctors also noted [Plaintiff's] concentration was intact," generally referencing the reports from the VAMC (ECF No. 12-9 at 100–84) and Dr. Osuala's 2015 assessment at which Plaintiff reported having used PCP two hours prior (ECF No. 12-12 at 3). ECF No. 12-2 at 26. But this evidence merely led the ALJ to

34

determine that there was no quantitative difference in Plaintiff's ability to maintain concentration, persistence, or pace, whether he was using or not using PCP—that is, in both situations, Plaintiff had moderate limitations in that area. The evidence does not, therefore, conclusively establish that Plaintiff was capable of sustaining simple, routine, unskilled work despite his deficits in concentration.

Perhaps the best medical evidence that might illustrate Plaintiff's ability to sustain such work is Dr. Ragsdale's December 22, 2015, consultative evaluation report based on his review of Plaintiff's medical records, which opined that Plaintiff was "capable of maintain attention and persistence for 2-hour intervals while doing a task-specific occupation with nominal social demands." ECF No. 12-3 at 36. But the ALJ himself discounted that conclusion, noting that Plaintiff had not yet been diagnosed with PTSD at the time of the report and that "additional evidence was added to the file after [that] review of the case that supports greater limitations" than those included there. ECF No. 12-2 at 29. Moreover, in contrast to Dr. Ragsdale's opinion, Dr. Weinstock indicated that Plaintiff may not be able to sustain concentration, persistence, or pace for a period of time satisfactory to an employer when not currently intoxicated (although, again, Dr. Weinstock evaluated Plaintiff two days after he had used PCP). ECF No. 12-9 at 187

Other evidence in the administrative record fails to establish that Plaintiff "is capable of completing simple, routine tasks . . . limited to unskilled work" despite his limitation in this area. *Davis*, 272 F. Supp. 3d at 172. Plaintiff reported that he completed cosmetology school in 1996 and two years of college in 2002, but those accomplishments were before his PCP addiction became severe. ECF No. 12-6 at 6–7. Thus, they predate medical evidence in the record suggesting that Plaintiff's drug use may have permanently affected his functioning, such as Dr. Weinstock's 2014 consultative examination report and Dr. Maki's 2014 report based on her review of the

35

medical records. ECF No. 12-3 at 9; ECF No. 12-9 at 190. Prior to May 2014, the time that Plaintiff reported he first stopped working due to his substance abuse, he had been working part-time as a hairdresser for approximately a year and a half. *Id.* at 7. Since then, as he testified at his hearing before the ALJ, Plaintiff has been able to maintain only part-time work as a hairstylist and only for weeks at a time. ECF No. 12-2 at 51–52. That testimony is supported by Plaintiff's medical records, which state that as of November 2014, Plaintiff had found work as a hairdresser but was making less than $500 a month. ECF No. 12-9 at 123. To be sure, the record does indicate that, when sober, Plaintiff can complete short, simple, routine tasks like using public transportation (*id.* at 54, 56–57); however, it does not establish that he can sustain simple, routine, and unskilled work. *See Davis,* 272 F. Supp. 3d at 172.

Thus, the RFC that the ALJ assigned to Plaintiff appear to suffer from a conflation of the ability to *perform* specific tasks and the ability to *stay* on task, as warned against in *Petty*, 204 F. Supp. 3d at 206–207. Because (1) the ALJ failed to explain how Plaintiff's limitation in maintaining concentration, persistence, or pace is consistent with an RFC that finds him capable of completing a normal work day and work week doing simple, routine, unskilled work; and (2) the record does not establish on its own that Plaintiff is capable of such work, Plaintiff's motion for reversal should be granted on this ground, and, as discussed below, the case should be remanded to the SSA for further administrative proceedings.

### C. The ALJ's Evaluation of Plaintiff's Subjective Claims

Finally, Plaintiff challenges the ALJ's finding that Plaintiff's statements concerning the intensity, persistence and limiting effects of his impairments, were "not entirely consistent with the objective medical and other evidence." ECF No. 15-1 at 9–10; ECF No. 12-2 at 28. Plaintiff contends that "[s]ignificantly absent from the [ALJ's] analysis is any explanation of the specific

36

statements made by [ ] Plaintiff concerning the intensity, persistence, and limiting effects of his symptoms" that were inconsistent with that evidence and that the ALJ "made no attempt to identify the medical evidence which [ ] Plaintiff's statements were[] not consistent with."  ECF No. 15-1 at 10.  Plaintiff's statements are factually inaccurate: the ALJ identified the statements that at issue and explained, with citation to record evidence, why they were inconsistent with that evidence.

When evaluating Plaintiff's subjective claims regarding the intensity, persistence, and limiting effects of Plaintiff's symptoms,

> the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight."

*Butler*, 353 F.3d at 1005 (quoting SSR 96-7p, 1996 WL 374186 at *2 (superseded by SSR 16-3p, 2017 WL 5180304)); *Petty*, 204 F. Supp. 3d at 209.  When evaluating credibility determinations, a "reviewing court will only intercede where an ALJ fails to articulate a rational explanation for his or her finding."  *Grant v. Astrue*, 857 F. Supp. 2d 146, 156 (D.D.C. 2012); *see Simila*, 573 F.3d at 517 (an ALJ's credibility determination should not be reversed unless it is "patently wrong").  If the ALJ's credibility determination and analysis "had a rational basis supported by the ALJ's consideration of the record evidence, and the evidence the ALJ cited in support of [his] credibility determination is appropriate and consistent with the medical opinions of record," the ALJ's determination should stand.  *Davis*, 272 F. Supp. 3d at 173.

Here, the ALJ explained that Plaintiff testified that he was "unable to work due to PTSD that prevents him from getting out of bed and focusing and caused memory loss," that "his dependency on PCP prevents him from working," and that "he has difficulty interacting with people." ECF No. 12-2 at 28 (citing ECF No. 12-2 at 44–45, 49).  The ALJ was required to determine if Plaintiff would be disabled in the absence of substance abuse; therefore, he needed to separate

37

Plaintiff's limitations due to PCP use from Plaintiff's limitations due to PTSD and depression. In making the determination that Plaintiff's statements regarding the effects of his symptoms of PTSD and depression alone were inconsistent with the record evidence, the ALJ specified the evidence on which he relied. He noted that Plaintiff was "appropriately groomed, cooperative, and ha[d] normal psychomotor activity, an euthymic mood, and normal speech" when he was not under influence of PCP during treatment at an inpatient facility. ECF No. 12-2 at 28 (citing ECF No. 12-9 at 107). In contrast, when Plaintiff was intoxicated at a 2015 consultative examination, he was "uncooperative, hostile, loud, belligerent, and presented with a disheveled and malodorous appearance, inappropriate mood, and poor eye contact." ECF No. 12-2 at 28 (citing ECF No. 12-12 at 4). The ALJ further referenced the notes from the VA homeless clinic that Plaintiff attended. ECF No. 12-2 at 28. In an October 2014 visit to the clinic, when Plaintiff was under the influence of PCP, he was "unable to formulate sentences, had difficulty understanding information, slurred speech, blunted affect, and he was easily distracted." *Id.* (citing ECF No. 12-9 at 115–16). In a later, sober visit to the clinic, Plaintiff "was well groomed, he had normal speech, good eye contact, an euthymic mood, and logical thought." ECF No. 12-2 at 28 (citing ECF No. 12-9 at 122–23). The ALJ determined that Plaintiff's statements—specifically, that his PTSD prevented him from working—were inconsistent with this evidence, which tended to show that when Plaintiff was not using PCP, he was significantly more functional than when he was using, notwithstanding his other diagnoses and symptoms. ECF No. 12-2 at 28. The ALJ further pointed out that Plaintiff had occasionally worked during the relevant period of time, thus contradicting Plaintiff's statements about the limiting effects of his impairments. *Id.* at 30. The ALJ's credibility determination is sufficiently supported and Plaintiff's motion should be denied on this ground.

## IV.     REMEDY

Plaintiff asks the Court to reverse the ALJ's judgment as erroneous as a matter of law or, in the alternative, to remand the case to the Social Security Administration for a new administrative hearing.  ECF No. 15-1 at 1.  A court may reverse judgment and order a remand for benefits "if 'the evidence on the record as a whole is clearly indicative of disability and additional hearings would serve no purpose other than to delay the inevitable receipt of benefits.'" *Prices v. Berryhill*, No. CV 16-2469 (CKK/RMM), 2018 WL 4381098, at *9 (D.D.C. Feb. 14, 2018) (quoting *Espinosa v. Colvin*, 953 F. Supp. 2d 25, 35–36 (D.D.C. 2013), *report and recommendation adopted*, No. CV 16-2469 (CKK), 2018 WL 4381060 (D.D.C. Mar. 5, 2018)).  In this case, the ALJ's opinion contained an error because it failed to explain how Plaintiff's moderate limitation in the ability to maintain concentration, persistence, or pace was consistent with an RFC assessing that, in the absence of substance abuse, he is able to sustain simple, routine, unskilled work.  However, the evidence in the record does not clearly indicate that Plaintiff has a disability so as to warrant a reversal.  Rather, the SSA should be permitted an opportunity to address the deficiencies in its determination.  *See, e.g.*, *Gordon v. Colvin*, No. 15-cv-1028 (CKK/GMH), 2016 WL 6088263, at *16 (D.D.C. Sept. 30, 2016) ("Remand is inappropriate where 'it would be an idle and useless formality,' or when, on the basis of the record, a court is convinced that remand would result in the ALJ[ ] reaching the same result." (internal citations omitted) (first quoting *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009), then citing *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013))), *report and recommendation adopted*, 2016 WL 6088266 (D.D.C. Oct. 18, 2016).

## V.     CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment of reversal (ECF No. 15) be **GRANTED IN PART** to the extent that it seeks

remand to the Social Security Administration for further administrative proceedings and **DE-NIED IN PART** to the extent that it seeks reversal, and further **RECOMMENDS** that Defendant's motion for judgment of affirmance (ECF No. 16) be **DENIED** and this action be **RE-MANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings consistent with this recommendation.

*     *     *     *     *

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections. The parties are further advised that failure to timely file objections to the findings and recommendations set forth in this report may waive the right of appeal from an order of the District Court adopting such findings and recommendations. *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date:   May 12, 2020

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE